John R. Mellgren (he/him) (OSB # 114620)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
Tel: 541-359-0990
Email: mellgren@westernlaw.org

*Attorney for Plaintiffs*

Nicholas S. Cady (he/him) (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

*Attorney for Plaintiff Cascadia Wildlands*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS** and **OREGON WILD**, Oregon non-profit corporations,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>**CHERYL ADCOCK**, in their official capacity as Field Manager of the Siuslaw Field Office, Northwest Oregon District BLM; and **PAUL TIGAN**, in their official capacity as Field Manager of the Marys Peak Field Office, Northwest Oregon District BLM; and **UNITED STATES BUREAU OF LAND MANAGEMENT**, an administrative agency of the United States Department of Interior,<br><br>                              Defendant. | Case No. 6:22-cv-00767<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violations of National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.,* and Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

**INTRODUCTION**

1.    The Bureau of Land Management's ("BLM") planned N126 LSR Landscape Plan Project ("N126 Project") is one of the largest commercial timber sales in Oregon's recent history. The Project involves the commercial logging of forests that lie west of Eugene, Oregon and north of Highway 126. The N126 Project area encompasses stands that range from 30 to 130 years-old and includes portions of seven watersheds. Additionally, the area is located within the geographic range of the northern spotted owl, marbled murrelet, and Oregon Coast coho salmon. All of these species are listed as threatened under the Endangered Species Act ("ESA").

2.    The N126 Project authorizes commercial logging in land use allocations specifically reserved from commercial logging in the BLM's governing land use plan. Approximately 14,227 acres of Late-Successional Reserve ("LSR") Land Use Allocation ("LUA") will be commercially logged. Approximately 2,003 acres of Riparian Reserve LUA will be commercially logged. The Project is designed to generate at least 380 million board feet ("MMBF") of lumber. As part of the project, between 50 and 90 miles of new roads will be constructed. Additionally, between 300 and 420 miles of existing roads will be renovated or rebuilt.

3.    The BLM's failure to follow the management directions of its own land use plan violates the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* Additionally, the N126 Project deserves careful consideration based on the project area's site-specific conditions, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* Instead of taking the NEPA-mandated hard look, the BLM published a

flawed environmental analysis ("EA") that entirely omitted site-specific analysis and is using Determinations of NEPA Adequacy ("DNAs") to implement individual logging projects.

4.    Plaintiffs, Cascadia Wildlands and Oregon Wild (collectively "Plaintiffs"), bring this civil action arising under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Plaintiffs challenge the BLM's issuance of the N126 EA/Finding of No Significant Impact ("FONSI") and Decision Record for violations of federal laws and regulations intended to protect the public's natural resources and ensure informed, well-reasoned decision-making.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction under 28 U.S.C. § 1331. Final agency action exists that is subject to judicial review pursuant to 5 U.S.C. § 704. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202 and 5 U.S.C. §§ 705 & 706.

6.    Venue in this Court is proper under 26 U.S.C. § 1391 because all, or a substantial part, of the events or omissions giving rise to this litigation occurred within this judicial district. The BLM officials who authorized the decisions at issue in this litigation are headquartered in offices located within this judicial district. The BLM Siuslaw Field Office, where the N126 Project Decision Record, the Pucker Up Density Management Project Decision Record, and the Gone Fishin' Density Management Project Decision Record were all signed, is headquartered in Springfield, Oregon. The BLM Marys Peak Field Office, where the N126 Project Decision Record was also signed, is headquartered in Salem, Oregon. The NEPA analysis at issue in this litigation was prepared within this judicial

district. The BLM-managed lands and resources at issue in this litigation are located within this judicial district. Plaintiffs maintain offices within this judicial district.

7.    This case is filed properly in Eugene, Oregon pursuant to Local Rules 3.3 and 3.4 because the N126 Project pertains to public lands in Lane County, Oregon.

## PARTIES

8.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion.

9.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's wild lands, wildlife, and waters as an enduring legacy.

10.    Plaintiffs have organizational interests in the proper and lawful management of BLM-managed lands, and specifically such lands located in BLM's Northwest District. Plaintiffs expend significant resources to track management activities on these lands, comment on land management proposals during public comment periods, work with BLM staff on the development of land management proposals, and field check projects on these lands. Plaintiffs' aesthetic, recreational, scientific, and economic interests in the N126 Project area

will be adversely affected and irreparably injured if Defendants implement the N126 Project. Plaintiffs' and their members' use and enjoyment of the N126 Project area will be degraded and impaired if the Project is implemented as planned.

11.    Plaintiffs' staff and members regularly recreate in the N126 Project area to hike, enjoy nature, attempt to observe wildlife (such as northern spotted owls, marbled murrelets, salmonids including Oregon Coast coho, and red tree voles), photograph wildlife and forest ecosystems, and otherwise enjoy the aesthetics and scientific bounty of the N126 Project area. Plaintiffs' staff and members intend to return to the N126 Project area in the future to recreate and otherwise enjoy the N126 Project area. Plaintiffs' staff and members will likely not return to the N126 Project area if the logging contemplated by the N126 Project is implemented.

12.    Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have diminished the trust between the BLM and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to Plaintiffs and their interests.

13.    Plaintiffs, their staff, and their members are also procedurally harmed by the BLM's failure to comply with federal law, as alleged in this complaint.

14.    Plaintiffs actual and procedural injuries are caused by the BLM's approval of the N126 Project.

15.     Plaintiffs seek to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the N126 Project area and the ESA-listed species that occupy it. Thus, Plaintiffs' injuries would be redressed by the relief sought.

16.     Plaintiffs submitted timely written comments, a formal administrative protest, and an appeal to N126 Project alleging, among other issues, that the BLM's failure to provide site-specific analysis and prepare an environmental impact statement ("EIS") violated federal law.

17.     Defendant CHERYL ADCOCK is Field Manager of the Siuslaw Field Office, Northwest Oregon District BLM, and is one of two Responsible Officials who signed the N126 Project Decision Record, and is the Responsible Official who signed the Gone Fishin' Density Management Project Decision Record. An Acting Field Manager of the Siuslaw Field Office was the Responsible Official who signed the Pucker Up Density Management Project Decision Record. Adcock is sued in their official capacity.

18.     Defendant PAUL TIGAN is Field Manager of the Marys Peak Field Office, Northwest Oregon District BLM and is one of two Responsible Officials who signed the N126 Project Decision Record. Tigan is sued in their official capacity.

19.     Defendant BLM is an agency or instrumentality of the United States and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations.

//

//

//

//

## STATEMENT OF FACTS
*2016 Northwestern and Coastal Oregon Record of Decision*
*and Resource Management Plan*

20.     The 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("2016 RMP") provides overall direction for all resources on BLM-administered lands in northwestern Oregon, including the lands at issue here.

21.     The overall purpose of the 2016 RMP is, in relevant part, to provide a sustained yield of timber, contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, and restore fire-adapted ecosystems. The 2016 RMP provides this direction through different designated land use allocations which have different management objectives and management directions. The management directions in the 2016 RMP identify what future actions may or may not be allowed within the different land use allocations.

22.     The relevant land use allocations here are the Late Successional Reserves ("LSRs") and Riparian Reserves.

23.     The BLM's primary management objectives for the LSRs are to maintain nesting-roosting habitat for the northern spotted owl and to promote the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl.

24.     The BLM's primary management objectives for the LSRs require it to limit its actions to those that do not preclude or delay development of northern spotted owl nesting-roosting habitat by 20 years or more. The BLM is required to follow its management direction within

the 2016 RMP and allowable use restrictions for LSRs regardless of northern spotted owl occupancy.

25.     The BLM's primary management objective for Riparian Reserves is to contribute to the conservation and recovery of ESA-listed fish species and their habitats; maintain and restore natural channel dynamics, processes, and the proper functioning condition of riparian areas; and maintain water quality and streamflows to protect aquatic biodiversity and to provide quality water for recreation and drinking water sources. The BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for Riparian Reserves, including using site-specific Best Management Practices to maintain water quality during land management actions.

*National Environmental Policy Act*

26.     NEPA requires federal agencies to prepare, consider, and approve an adequate EIS for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

27.     If the proposed action may have a significant environmental effect, federal agencies must prepare an EIS. 42 U.S.C. § 4332(2)(C).

28.     In determining whether a proposed action may have a "significant" environmental effect, the context and intensity of the action must be considered. 40 C.F.R. § 1508.27 (1978).

29.     In evaluating intensity, the agency must consider numerous factors, including impacts that may be both beneficial and adverse; the unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects on the quality of the human

environment are likely to be highly controversial; the degree to which the possible effects on

the human environment are highly uncertain or involve unique or unknown risks; whether

the action is related to other actions with individually insignificant but cumulatively

significant impacts; the degree to which the action may adversely affect an endangered or

threatened species or its critical habitat; and whether the action threatens to violate federal,

state, or local law or requirements imposed for the protection of the environment. 40 C.F.R.

§ 1508.27(b) (1978).[1]

30.     To determine whether an action requires an EIS as required by NEPA, an action

agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b) (1978). An

EA should be a concise public document that briefly describes the proposal, examines

reasonable alternatives, considers environmental impacts, and provides a listing of

individuals and agencies consulted. 40 C.F.R. § 1508.9 (1978). After preparing an EA, the

agency will either issue a Finding of No Significance ("FONSI") or prepare an EIS. If the

agency decides that an EIS is not needed, it must undertake a thorough environmental

---

[1] The Council on Environmental Quality ("CEQ") first promulgated NEPA regulations in 1978. *See* 40 C.F.R. Part 1500 (1978). On July 16, 2020, CEQ issued a final rule promulgating new NEPA regulations. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020). The 2020 regulations were challenged in multiple lawsuits and subsequently CEQ undertook a third revision of the NEPA regulations. 'Phase I' of that rulemaking was finalized on April 20, 2022, overturning several parts of the 2020 regulations and restoring the language of the 1978 regulations. *National Environmental Policy Act Implementing Regulations Revisions; Final Rule*, 87 Fed. Reg. 23,453 (April 20, 2022) (to be codified at 40 C.F.R. §§ 1502, 1507, 1508). CEQ plans to begin 'Phase II' rulemaking this summer. The N126 Project began while the 1978 NEPA regulations were still in effect (the initial public scoping period required by NEPA began in late 2018), and so the 1978 regulations apply to the projects challenged in this complaint.

analysis and supply a convincing statement of reasons that explains why a project's impacts are not significant.

31.     To make a rational determination of non-significance, NEPA documents must consider the proposed action's direct, indirect, and cumulative environmental impacts. 40 C.F.R. § 1508.8 (1978). Direct impacts are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a) (1978). Indirect impacts are caused by the action and are later in time or farther removed in distance but still reasonably foreseeable. *Id.* § 1508.8(b) (1978). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id.* § 1508.8 (1978). Cumulative impacts result when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. *Id.* § 1508.7 (1978).

32.     Finally, NEPA requires federal agencies to release environmental information to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b) (1978). The information released must be of high quality and sufficient so the public can question the agency's rationale and understand the agency's decision-making process. *Id.*

### *Determinations of NEPA Adequacy*

33.     DNAs are not NEPA documents. A DNA is a BLM tool that is not mentioned in the Council on Environmental Quality NEPA Regulations. As described in the BLM's NEPA Handbook, DNAs are used to confirm that an action is adequately analyzed in an existing

NEPA document and conforms to the approved land use plan. DNAs do not contain NEPA analysis.

34.    The BLM has stated that there are four appropriate scenarios for the use of DNAs: (1) when there is a new proposed action that is similar to a previous action that was already analyzed in a NEPA document, (2) when there is a new proposed action that is a part of a broader action that was already analyzed in a NEPA document, (3) when the original NEPA analysis is old and the agency needs to determine whether new analysis is needed due to new information or changed circumstances, and (4) when there is new information not considered in existing NEPA analysis and the agency needs to determine whether that new information warrants new analysis, regardless of how much time has passed.

35.    In any of the above scenarios the BLM uses a "DNA worksheet" to determine whether existing NEPA document(s) can satisfy NEPA's requirements for the proposed action. The BLM's NEPA Handbook makes it clear that the DNA worksheet is not a NEPA document. It does not contain any new NEPA analysis and is merely a list of five questions the BLM answers to determine if a proposed action is adequately covered by prior NEPA analysis.

*The N126 LSR Landscape Plan Project*

36.    The BLM did not conduct site-specific analysis for the N126 Project. According to the BLM, the N126 EA is a programmatic analysis, not an implementation plan. According to the BLM, site-specific actions implementing the N126 Project would be reviewed in subsequent DNAs. As defined in the BLM's NEPA Handbook, DNAs are not NEPA

documents and do not contain NEPA analysis – they merely confirm that a proposed action is already adequately analyzed in existing NEPA documents.

37.    The N126 Project authorizes treatment of 16,230 acres across a 31,470-acre project area. This includes 14,227 acres within LSR and 2,003 acres in Riparian Reserves, with a total estimated harvest volume of 380 MMBF (million board feet) of lumber. Additionally, 50 to 90 miles of new roads will be constructed and 300 to 420 miles of existing roads will be renovated.

38.    Of the 14,227 acres of LSR that will be treated, 13,353 acres will be harvested commercially. Of the commercially harvested stands, 250 acres will have their canopy cover reduced to 60 percent. Of the commercially harvested stands, 13,000 acres will have their canopy cover reduced to between 40 percent and 55 percent.

39.    All 2,003 acres of Riparian Reserves will be harvested commercially. Of the commercially harvested Riparian Reserve stands, 202 acres will have canopy cover reduced to 60 percent. Of the commercially harvested Riparian Reserve stands, 1,801 acres will have canopy cover reduced to between 45 percent and 55 percent.

40.    The N126 Project area encompasses seven watersheds, including the Lake Creek watershed within which most of the Project exists. Additionally, the N126 Project is located within the geographic range of the northern spotted owl, marbled murrelet, and Oregon Coast coho salmon. The spotted owl, murrelet, and coho salmon are classified as threatened under the ESA.

41.    The BLM claims that the N126 Project's purpose for logging LSR LUA stands is twofold. First, it claims logging will promote the development and retention of large, open-

grown trees and multi-cohort stands and promote or enhance the development of structural complexity and heterogeneity. Second, the BLM claims logging will develop diverse understory plant communities and increase or maintain vegetative species diversity.

42.    The BLM claims that the N126 Project's purpose for logging Riparian Reserve LUA stands is threefold. First, BLM claims logging Riparian Reserve LUA stands will speed the development and improve the ability of stands, in the middle zone and outer zone of the project area, to provide trees that would function as stable wood in streams. Second, BLM claims logging Riparian Reserve LUA stands will speed the development and improve the quality of complex late-successional forest characteristics of stands in the project area over the long term. Third, BLM claims logging Riparian Reserve LUA stands will increase the diversity of riparian species and develop structurally complex stands.

43.    Plaintiffs provided timely comments at every stage of the N126 Project. Plaintiffs' comments raised, among other issues, the following concerns:

    a.   some stands in the project area are wild, native forests, not single-story timber plantations as provided in the N126 EA;

    b.   a landscape plan covering a geographic area that the BLM (through designation of LSRs and Riparian Reserves in its 2016 RMP) and the federal government generally (through the Northwest Forest Plan) has recognized as important for conservation needs to incorporate conservation science to consider the regional cumulative effects from the project;

    c.   impacts to threatened owls, murrelets, and coho salmon are not considered;

d.   the impossibility of managing habitat for threatened species at the landscape level without conducting any actual analysis of wildlife habitat at the landscape level or site-specific level;

e.   the BLM's assumption that maintaining under 70% canopy cover is needed to restore complex late-successional forests is not supported by the best available science;

f.   the BLM's assumption that maintaining 60% canopy cover in specific areas would minimize short-term risks to resident spotted owls from restoration actions misrepresents the best available science;

g.   the BLM did not adequately consider the cultural history, and its influence on the present-day landscape, of the N126 Project area;

h.   fire disturbance is not addressed;

i.   fire effects at a site-specific level are missing;

j.   future changes to fire risk from proposed logging are also missing;

k.   analyzing a representative area within the N126 Project area and then extrapolating that data across the entire N126 Project area is a far inferior method compared to site-specific analysis, and doing so conflicts with guidance in the RMP and NEPA;

l.   the N126 EA treats the N126 Project area as a uniform whole despite the fact that the area is diverse and sits in a dynamic transition zone between the Willamette Valley and Oregon Coast;

m. the N126 EA assumes a uniform spacing of trees in restored stands, but conditions in healthy northern spotted owl nesting-roosting habitat, in murrelet habitat, and in riparian areas would be more naturally varied;

n. impacts to watersheds were not adequately analyzed;

o. the analytic process is focused entirely on silviculture to the exclusion of more relevant factors such as stream type, watershed condition, or fish populations;

p. and the analysis uses assumptions based on a 40-year time frame.

44. Plaintiffs' comments also highlighted the lack of site-specific analysis in the N126 Project EA.

45. The N126 EA states that over 26,000 acres of the 31,470 -acre project area is primarily dispersal habitat for the northern spotted owl and buffer habitat for the marbled murrelet. Despite this, the N126 Project EA contains no site-specific analysis of the effects of the N126 Project on ESA-listed species (specifically the northern spotted owl, marbled murrelet, and Oregon Coast coho salmon). There is also no site-specific analysis of the effects on habitat for ESA- listed species: the N126 EA relies on the 2016 RMP's generalized western-Oregon analysis of listed species and then defers site-specific analysis of effects to habitat to a later phase.

46. The Fish and Wildlife Service's ("FWS") Biological Opinion (covering all of the BLM's Northwest Oregon District's Habitat Alteration Projects in Fiscal Year 2018-2019) states that the N126 Project will remove high-quality northern spotted owl habitat at a number of known owl sites and the N126 EA states that thinning will occur in 17 recently active northern spotted owl sites. And yet the N126 EA contains no analysis of the adverse

effects of those actions (or the rest of the project) on owls. Further, the fact that much of the proposed commercial logging will remove high-quality northern spotted owl habitat contradicts the BLM's generalized description of the project area as dispersal habitat.

47.    The 2016 RMP requires the BLM to assess a given project area for marbled murrelet structure, which is to include a buffer of 762 feet, before marbled murrelet nesting habitat is modified. Despite this requirement, the N126 EA contains no such assessment, even though the project area contains stands that are known to be occupied by marbled murrelets. There is no analysis using existing maps and surveys of occupied murrelet nesting stands and stand exams that could then be used to determine buffer habitat. The N126 EA merely states that the only expected adverse effects to the habitats of the northern spotted owl and the marbled murrelet are the adverse effects from road construction.

48.    There is also no analysis of the effects of the N126 Project on northern spotted owl prey such as flying squirrels and red tree voles.

49.    The N126 EA states that Oregon Coast coho salmon are present in six of the seven watersheds in the project area. Despite the planned treatment of 2,003 acres of harvest in Riparian Reserves and 50 to 90 miles of new road construction, the N126 EA does not contain any analysis of effects to Oregon Coast coho salmon in the N126 Project area. Instead, the BLM tiers its analysis of effects to Oregon Coast coho salmon to the 2016 RMP.

50.    There is also no baseline information and effects analysis of the specific treatments on specific stands and therefore there is a lack of site-specific analysis justifying the "need" for thinning in those stands. The N126 EA describes all stands as single-story timber

plantations. But as Plaintiffs and FWS have pointed out, there are many wild native forests in the N126 Project area. Stand-age data and site-specific descriptions of management history are necessary for a more complete analysis of the landscape and would inform a site-specific analysis of the effects of treatments. The N126 EA does not contain that information or analysis.

51.     Further, there is no analysis of fire effects at a site-specific level. For example, Plaintiffs point to evidence of a history of prescribed fires and/or a fire-maintained understory at several locations in the N126 Project area, which were not analyzed in the EA.

52.     There is also no site-specific analysis of future changes to fire risk from the proposed logging. The 2016 RMP contains management objectives that require the BLM to "[a]ctively manage the land to restore and maintain resilience of ecosystems to wildlife and decrease the risk of uncharacteristic, large, high-intensity/high-severity wildfires." Despite the N126 Project's authorization to treat 16,230 acres, future fire hazard and risk were not analyzed in the N126 EA. Many of the planned treatment areas are in mature forests, which numerous scientific studies have found to be more fire resistant than their younger counterparts. Instead of conducting any site-specific analysis regarding future risk, the BLM tiered its EA fire analysis to the 2016 RMP. The BLM then stated that there is no new information or circumstances that would change the effects anticipated in the 2016 RMP, despite the incredibly active fire seasons that Oregon has recently experienced and is likely to continue to experience. In the N126 EA, the BLM concluded that under all alternatives the overall fire risk in the N126 Project area would remain unchanged.

53.    The N126 EA also contains no site-specific analysis regarding the varied 31,470-acre N126 Project area. For example, there are substantial differences in climate across the 31,470-acre N126 Project area. Similarly, landscape patterns and relative humidity vary across the N126 Project area and are not analyzed. Those site-specific features all contribute to an area's fire risk and require site-specific analysis of their interaction with the management activities that are planned under the N126 Project. The N126 EA fails to recognize or analyze those effects. There is also no analysis of climate change and how its effects will interact with the N126 Project and subsequently affect future fire risk for the Project area.

54.    On August 12, 2020, the BLM issued its Decision Record and FONSI for the N126 Project. Plaintiffs timely submitted an Administrative Protest to the Decision Record and FONSI on August 28, 2020.

55.    Plaintiffs' Administrative Protest raised numerous concerns with the Decision Record and FONSI including, but not limited to:

  a.  the need for an EIS to address scientific controversy regarding the need for thinning to accelerate the development of old growth forests, especially in existing high-quality spotted owl habitat;

  b.  the failure to describe an accurate baseline for and take a hard look at current conditions;

  c.  the failure to consider a reasonable range of alternatives;

d.   the failure to take a hard look at impacts to, and scientific controversy surrounding impacts to, the northern spotted owl, marbled murrelet, and coho salmon and their habitats;

e.   the failure to provide site-specific analysis of the impacts to the northern spotted owl, marbled murrelet, and coho salmon;

f.   the failure to analyze indirect effects to owl prey;

g.   the failure to provide maps of mapped habitat and habitat conditions and known nest sites;

h.   the failure to take a hard look at aquatic impacts;

i.   the failure to take a hard look at the long-term adverse effects of logging on recruitment of dead wood that is essential to LSR objectives and spotted owl conservation;

j.   the failure to take a hard look at the lack of evidence that logging will enhance LSR objectives;

k.   the failure to take a hard look at the effects on carbon storage and climate change;

l.   and the failure to take a hard look at cultural context and land use.

56.   The BLM denied Plaintiffs' Administrative Protest by letter dated February 19, 2021.

57.   On February 22, 2021, the BLM released its final and official EA for N126. The final N126 EA provided no site-specific analysis of environmental effects. The final N126 EA contained the same defects raised in Plaintiffs' NEPA comments and Administrative Protest.

58.    On March 15, 2021, Plaintiffs timely filed a Notice of Appeal and Request for Stay of the N126 EA and FONSI to the Interior Board of Land Appeals ("IBLA").

59.    On April 12, 2021, Plaintiffs filed the Statement of Reasons for the Notice of Appeal and Request for Stay of the N126 EA and FONSI to the IBLA reiterating the same concerns raised in comments throughout the NEPA process and Administrative Protest to the EA Decision Record and FONSI for the N126 Project.

60.    On April 14, 2021, IBLA denied Plaintiffs' Request for Stay. The appeal was voluntarily dismissed at the request of Plaintiffs on September 7, 2021.

*The Pucker Up Density Management Project DNA*

61.    On April 15, 2021, the BLM issued the Pucker Up Density Management Project DNA ("Pucker Up DNA"), the first DNA released pursuant to the N126 EA/FONSI. In the Pucker Up DNA, the BLM concluded that (1) the proposal conforms to the applicable land use plan (2016 RMP) and (2) the analysis contained in the N126 EA fully covers the proposed action and satisfies the BLM's requirements under NEPA. The Pucker Up DNA does not contain any NEPA analysis. The Pucker Up DNA does not contain any site-specific NEPA analysis.

62.    Appendix A to the Pucker Up DNA describes the specifics of the BLM's proposed action: 415 acres of commercial and non-commercial thinning in reserve allocations in the Lake Creek watershed: 312 acres of commercial thinning in the LSR, 7 acres of commercial thinning in the outer Riparian Reserves, and 64 acres of non-commercial thinning in the LSR. The BLM also plans to construct almost one mile of new road and renovate about 4.5 miles of existing roads.

63.     On May 25, 2021, Plaintiffs filed timely comments on the Pucker Up DNA. Plaintiffs' comments raised concerns with the BLM's use of a DNA to implement this portion of the N126 Project. Under the guidelines in BLM's own NEPA Handbook, DNAs are not meant to contain new NEPA analysis, but rather are only to be used to ensure existing NEPA analysis adequately covers the proposed action. The N126 Project acreage designated for commercial logging by the Pucker Up DNA did not receive the requisite site-specific analysis of impacts necessary to comply with NEPA.

64.     On July 8, 2021, the BLM issued a final DNA and Decision Record for the Pucker Up Density Management Project.

65.     On August 6, 2021, Plaintiffs filed a Notice of Appeal and Request for Stay of the Pucker Up Density Management Project with the IBLA. On August 17, 2021, IBLA denied Plaintiffs' Request for Stay. The appeal was voluntarily dismissed at the request of Plaintiffs on September 7, 2021.

*The Gone Fishin' Density Management Project DNA*

66.     On October 19, 2021, the BLM issued the Gone Fishin' Density Management Project DNA ("Gone Fishin' DNA"), the second DNA released pursuant to the N126 EA/FONSI. In the Gone Fishin' DNA, the BLM concluded that (1) the proposal conforms to the applicable land use plan (2016 RMP) and (2) the analysis contained in the N126 EA fully covers the proposed action and satisfies the BLM's requirements under NEPA. The Gone Fishin' DNA does not contain any NEPA analysis. The Gone Fishin' DNA does not contain any site-specific NEPA analysis.

67.    Appendix A to the Gone Fishin' DNA describes the specifics of the BLM's proposed

action: 276 acres of commercial harvest in the LSR and Riparian Reserves and 29 acres of

non-commercial thinning in the LSR within the Lake Creek watershed. The BLM also plans

to construct half a mile of new road and renovate about 7 miles of existing roads.

68.    On November 17, 2021, Plaintiffs filed timely comments on the Gone Fishin' DNA.

Plaintiffs' comments raised concerns with the BLM's use of a DNA to implement this

portion of the N126 Project. Under the guidelines in BLM's own NEPA Handbook, DNAs

are not meant to contain new NEPA analysis, but rather are only to be used to ensure

existing NEPA analysis adequately covers the proposed action. The Gone Fishin' DNA does

not contain NEPA analysis. As such, the N126 Project acreage designated for commercial

logging in the Gone Fishin' DNA did not receive the requisite site-specific analysis of

impacts necessary to comply with NEPA.

69.    On February 2, 2022, the BLM issued a final DNA and Decision Record for the

Gone Fishin' Project. On February 28, 2022, Plaintiffs filed a Notice of Appeal and Request

for Stay of the Gone Fishin' Density Management Project with the IBLA. On March 16,

2022, IBLA denied Plaintiffs' Request for Stay. The appeal was voluntarily dismissed at the

request of Plaintiffs on March 21, 2022.

70.    The BLM also has at least two other projects that are in various stages of planning

under the N126 Project (Walker Point Density Management Project and TomCat Divide

Density Management Project). The BLM is proceeding with DNAs for both projects.

Plaintiffs may amend this complaint during the course of this litigation to include logging

contemplated by subsequent final DNAs as part of the implementation of the N126 Project.

## FIRST CLAIM FOR RELIEF
### (Violations of the National Environmental Policy Act)

**COUNT 1: Failure to take a "hard look" at the direct, indirect, and cumulative impacts of the N126 Project, the Pucker Up Density Management Project, and the Gone Fishin' Density Management Project.**

71.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

72.     The N126 Project Decision Record and accompanying EA violate NEPA because they fail to take a hard look at the direct, indirect, and cumulative impacts of the BLM's proposed action.

73.     The Decision Record for the Pucker Up DNA violates NEPA because it fails to take a hard look at the direct, indirect, and cumulative impacts of the BLM's proposed action.

74.     The Decision Record for the Gone Fishin' DNA violates NEPA because it fails to take a hard look at the direct, indirect, and cumulative impacts of the BLM's proposed action.

75.     NEPA and its implementing regulations require the Forest Service to disclose and analyze the environmental effects of the proposed action and alternatives to it. 42 U.S.C. § 4332; 40 C.F.R. § 1500.1(b) (1978). Specifically, the regulations explain that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (1978).

76.     The BLM is required to disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c), 1508.27(b)(7) (1978).

77.    When analyzing cumulative effects, the BLM must analyze the effects on the environment resulting from the incremental impacts of the action, and its alternatives, when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.§ 1508.7 (1978).

78.    To satisfy the requirements of the NEPA regulations, the BLM must take a "hard look" at the impacts resulting from the proposed action.

79.    The Defendants failed to take the requisite "hard look" at the direct, indirect, and cumulative impacts likely to result from the implementation of the N126 Project Decision Record.

80.    The Defendants failed to disclose and analyze a number of direct, indirect, and cumulative environmental effects from its proposed action. For example, but not limited to, impacts from implementation of the N126 Project Decision Record on site-specific fire risk (and future changes to fire risk from the proposed logging); effects on the northern spotted owl, marbled murrelet, and Oregon Coast coho salmon (all ESA-listed species) and their critical habitats; and site-specific baseline information and effects analysis of the specific treatments on specific stands.

81.    NEPA requires agencies to conduct site-specific analysis before approving a project. Neither the N126 EA, the Pucker Up DNA, nor the Gone Fishin' DNA contain site-specific analysis as required by NEPA. Specifically, all three documents fail to take a hard look at the environmental consequences of the proposed action or to include site-specific analysis.

82.    The Defendants failed to take the requisite hard look at the direct, indirect, and

cumulative effects of implementation of the N126 Project Decision Record as required by

NEPA, which is arbitrary, capricious, and not in accordance with the APA. 5 U.S.C. §

706(2)(A). The Defendants' conclusion in the Decision Records for the Gone Fishin' DNA

and Pucker Up DNA that no further analysis was necessary is arbitrary, capricious, and not

in accordance with the APA. *Id.*

## COUNT 2: Failure to Prepare an Environmental Impact Statement and Arbitrary and Capricious Finding of No Significant Impact

83.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

84.     NEPA requires the Defendants to prepare an EIS when a proposed major federal

action may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). In

determining whether a proposed action may "significantly" impact the environment, both

the context and intensity of the action must be considered. 40 C.F.R. §1508.27 (1978).

85.     An EA must contain sufficient information to determine whether to prepare an EIS

or issue a FONSI. The information presented in the EA must be of "high quality," and

include "accurate scientific analysis." 40 C.F.R. 1500.1(b) (1978). If the agency chooses not

to prepare an EIS it must adequately explain, through a convincing statement of reasons,

why potential effects are insignificant.

86.     In evaluating intensity, the agency must consider numerous factors, including impacts

that may be both beneficial and adverse; the unique characteristics of the geographic area

such as ecologically critical areas; the degree to which the effects on the quality of the human

environment are likely to be highly controversial; the degree to which the possible effects on

the human environment are highly uncertain or involve unique or unknown risks; whether

the action is related to other actions with individually insignificant but cumulatively

significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and whether the action threatens to violate Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

87.     If the proposed action may have a "significant" environmental effect according to any of the criteria, the agency must prepare an EIS. The significance of an individual factor may result in the need to prepare an EIS. The significance of multiple factors in combination may result in the need to prepare an EIS.

88.     The N126 Project is a major federal action authorized by BLM that would have a significant effect on the environment. The N126 Project implicates numerous significance factors that individually and cumulatively require the preparation of an EIS. The N126 Project would have significant adverse effects. The N126 Project will be implemented in areas with unique characteristics, including ecologically critical areas such as LSRs, Riparian Reserves, and designated critical habitat for ESA-listed species. The N126 Project will result in effects that are highly controversial, such as through effects on fire risk resulting from logging mature forests. The N126 Project will result in effects that are highly uncertain or involve unique or unknown risks because the BLM failed to conduct site-specific NEPA analysis, or otherwise disclose and analyze baseline conditions. The N126 Project is related to other actions with cumulatively significant impacts. The N126 Project will adversely affect ESA-listed species, such as the northern spotted owl, marbled murrelet, and certain salmonid species. The N126 Project threatens a violation of the FLPMA, as described in this Complaint.

89.     BLM did not prepare an EIS for the N126 Project. The significance factors implicated by the N126 Project are significant individually. The significant factors implicated by the N126 Project are significant when considered cumulatively. BLM's decision to authorize and implement the N126 Project without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF
### (Violation of the Federal Land Policy and Management Act)

90.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

91.     Congress enacted FLPMA in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). FLPMA requires the BLM to develop RMPs that govern the use of the land it manages. 43 U.S.C. § 1712. Once an RMP has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

92.     The N126 Project was developed under the 2016 RMP. The 2016 RMP provides overall direction for all resources on BLM-administered lands in northwestern Oregon, including the lands at issue here, through management directions for different land use allocations. Those land use allocations include LSRs and Riparian Reserves, which will be affected by the N126 Project.

93.     Specifically, the 2016 RMP provides management directions for LSRs, including: (1) a requirement that all stands that are currently northern spotted owl nesting-roosting habitat are maintained, regardless of owl occupancy status; and (2) a requirement that silvicultural

treatments do not preclude or delay development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands by 20 years or more.

94.      The N126 EA analyzes the project in a 40-year time horizon, stating that logged areas, including northern spotted owl nesting-roosting habitat, would be restored after 40 years. In preparing the N126 EA, the BLM ignored the requirements of the 2016 RMP, including requirements to maintain nesting-roosting habitat in the LSR and to not delay development of nesting-roosting habitat by 20 years or more.

95.      In failing to comply with its 2016 RMP or provide a reasonable explanation as to how the N126 Project will meet the 2016 RMP requirements, the BLM has violated FLPMA. This is arbitrary, capricious, and not in accordance with the APA. 5 U.S.C. § 706(2)(A).

## PLAINTIFFS' REQUEST FOR RELIEF

Plaintiffs respectfully request that this court:

a)  Declare that the Defendants' approval of the N126 Project violates NEPA, FLPMA, and their respective implementing regulations and thus is arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

b)  Vacate and set aside the Decision Record, FONSI, and EA for the N126 Project, and order Defendants to withdraw the Decision Record, FONSI, EA, and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

c) Vacate and set aside the Decision Record for the Pucker Up DNA and order Defendants to withdraw the Decision Record and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

d) Vacate and set aside the Decision Record for the Gone Fishin' DNA and order Defendants to withdraw the Decision Record and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

e) Enjoin Defendants and their contractors, assigns, and other agents from proceeding with implementing the N126 Project unless and until the violations of federal law set forth herein have been corrected;

f) Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

g) Award Plaintiffs their costs of suit, reasonable expenses, and attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

h) Grant such further relief as the Court deems just and equitable in order to provide Plaintiffs with relief and protect the public interest.

Respectfully submitted and dated this 25th day of May, 2022.

/s/ John R. Mellgren
John R. Mellgren (he/him) (OSB # 114620)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
Tel: 541-359-0990
Email: mellgren@westernlaw.org

/s/ Nicholas S. Cady
Nicholas S. Cady (he/him) (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Email: nick@cascwild.org