Dana M. Johnson, Idaho Bar #8359
Wilderness Watch
P.O. Box 9623
Moscow, Idaho 83843
Tel: (208) 310-7003
danajohnson@wildernesswatch.org

Matthew K. Bishop, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Sangye Ince-Johannsen, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: 541-359-3239; 541-778-6626
frost@westernlaw.org; sangyeij@westernlaw.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, et al., | Case No. 1:19-cv-00203-CWD |
| Plaintiffs, | **PLAINTIFFS' BRIEF OPPOSING DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT, AND REPLYING TO THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | |
| U.S. FOREST SERVICE, et al., | |
| Defendants. | |

Table of Contents.

Table of Contents. ........................................................................................................ i

Table of Authorities. ................................................................................................... ii

Jurisdiction. ................................................................................................................1

Argument. ...................................................................................................................3

    A.  The BiOp Applies to the National Policy. ........................................................3

    B.  The National Policy is "Agency Action" Under Section 7 of the ESA. .............4

    C.  The National Policy Remains in Effect. .........................................................12

    D.  Federal Defendants' June 2020 Actions Were Unlawful. ................................14

    E.  Federal Defendants Must Reinitiate Consultation ...........................................17

    F.  The Relief Guardians Request is Warranted under the ESA. ...........................19

Conclusion. ...............................................................................................................21

Table of Authorities.

Cases:

*Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229 (9th Cir. 2001) .............................4, 5, 17, 18

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054 (6th Cir. 1995) ..............1

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................2

*Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075 (9th Cir. 2017)......................................11, 12

*Ctr. for Food Safety v. Vilsack*,
    No. C 08-00484-JSW, 2009 WL 3047227 (N.D. Cal. Sept. 21, 2009) ..............................7

*Crow Indian Tribe v. United States*,
    No. 17-v-89-M-DLC, 2018 WL 4145908 (D. Mont. Aug. 30, 2018) ..............................20

*Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075 (9th Cir. 2015) ...............................9, 14, 20

*Defs. of Wildlife v. Flowers*,
    No. CIV 02-195-TUC-CKJ, 2003 WL 22145708 (D. Ariz. Aug. 18, 2003)....................15

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................................5

*Envtl. Prot. Info. Ctr. v. FWS*,
    No. C 04-04647-CRB, 2005 WL 3021939 (N.D. Cal. Nov. 10, 2005) ..............................9

*Friends of the Clearwater v. USFS*,
    20-cv-00322-BLW, 2021 WL 3408595 (D. Idaho Aug. 4, 2021) ..........................1, 15, 20

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006)........................................................12

*Fund for Animals, Inc. v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997) ..............................................6, 9

*Hells Canyon Preservation Council v. USFS*, 593 F.3d 923 (9th Cir. 2010) ................................2

*Karuk Tribe of Cal. v. USFS*, 681 F.3d 1006 (9th Cir. 2012)....................................................6, 14

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)......................................16

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)........................................................9

*Oceana v. Pritzker*, 75 F. Supp. 3d 469 (D.D.C. 2014)................................................................19

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007).........................................18, 19, 20

*Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994)....................................................9

*Peavey v. United States*, 128 F. Supp. 85 (D.D.C. 2015) ...........................................................3

*Seattle Audubon v. Sutherland*,
    No. CV06–1608MJP, 2007 WL 1300964 (W.D. Wash. May 1, 2007)...........................18

*Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362 (9th Cir. 1990)........................................2

*S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217 (10th Cir. 2002) .......................................2

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
    486 F.3d 638 (9th Cir. 2007) .............................................................................19

*Strahan v. Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997) ...........................................................18

*Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006) ....................................10

*Wilderness Soc'y v. Norton*, 434 F.3d 584 (D.C. Cir. 2006) .........................................................1


Statutes:

5 U.S.C. § 551(4) .....................................................................................................12

5 U.S.C. § 706(1) .....................................................................................................15

5 U.S.C. § 706(2)(A) .................................................................................................15

16 U.S.C. § 1536(a)(2)................................................................................................7

16 U.S.C. § 1536(b)(4)(C)(iv) ......................................................................................4

16 U.S.C. § 1538.......................................................................................................17


Regulations:

50 C.F.R. § 402.02 .........................................................................................7, 8, 14, 18

50 C.F.R. § 402.14(g) ...........................................................................................7, 8, 18

50 C.F.R. § 402.14(i)(3)..............................................................................................2

50 C.F.R. § 402.14(m) ........................................................................................16

50 C.F.R. § 402.16(a) ........................................................................................11


Federal Register Notices:

*Interagency Cooperation - Endangered Species Act*, 51 Fed. Reg. 19,926 (June 3, 1986).....16, 17

*Use of Bait in Hunting*, 59 Fed. Reg. 11,765 (Mar. 14, 1994)........................................7

*Use of Bait in Hunting*, 59 Fed. Reg. 17,758 (Apr. 14, 1994) .....................................12

*Use of Bait in Hunting*, 60 Fed. Reg. 14,720 (Mar. 20, 1995)..................................8, 12


Miscellaneous:

FED. R. CIV. P. 8(c) .............................................................................................1

Plaintiffs WildEarth Guardians et al. ("Guardians") hereby respectfully file this brief opposing Defendants' and Defendant-Intervenors' motions for summary judgment, and replying to their opposition to Guardians' motion for summary judgment and injunctive relief.

Jurisdiction.

No defendant challenges Guardians' standing. However, all defendants assert statute of limitations issues. In a footnote, Federal Defendants assert all grizzly mortalities at black bear baiting sites on national forest lands "occurred outside of the [six-year] statute of limitations period," and therefore cannot form a basis for any claim for relief. Ds' Br. 23 n.7 (citing 28 U.S.C. § 2401(a)). In turn, Wyoming and Idaho seek to characterize Guardians' reinitiation claim as a challenge to the National Policy, which was adopted in 1995. WY Br. 16; ID Br. 16, n.13.

In their operative answers, Federal Defendants and Wyoming did not affirmatively state statute of limitations as an affirmative defense and, therefore, waived it. FED. R. CIV. P. 8(c); *cf.* ECF 69 at 15–16; ECF 75 at 4. Even if not waived, Federal Defendants' jurisdictional challenge should not be relegated to a footnote. *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1058–59 (6th Cir. 1995) (an issue "drop[ped]" in a footnote and not raised in the argument section of a brief is not properly raised before the Court).

Regardless, defendants' assertions have no merit. As the Court has noted, Federal Defendants' failure to reinitiate consultation is properly reviewable as "inaction" under the APA. ECF 87, at 10; *accord Friends of the Clearwater v. USFS*, 20-cv-00322-BLW, 2021 WL 3408595, at *4 (D. Idaho Aug. 4, 2021). Guardians' challenges to Federal Defendants' inaction are not time-barred because they do not "complain about what the agency has done but rather about what the agency has yet to do." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 589 (D.C. Cir. 2006); *Institute for Wildlife Protection v. FWS*, No. 07-CV-358-PK, 2007 WL 4117978 *5–6 (D.

Or. Nov. 16, 2007) (each day an agency fails to perform an ongoing duty under the ESA

"constitutes a single, discrete violation of the statute"); *S. Utah Wilderness Alliance v. Norton*,

301 F.3d 1217, 1232 (10th Cir. 2002), *rev'd on other grounds*, 542 U.S. 55 (2004) (unlawful

agency inaction "should be considered an ongoing failure to act, resulting in an ever-green cause

of action for failure to act").[1]

 Moreover, Federal Defendants never publicly reported take of grizzlies over bait under

the incidental take statement ("ITS"). During discovery, Guardians sought production of

documents related to the Forest Service's duty to monitor and report on the impacts of incidental

take. *See* 50 C.F.R. § 402.14(i)(3) (2022) ("In order to monitor the impacts of incidental take, the

Federal agency or any applicant *must* report the progress of the action and its impact on the

species to the Service as specified in the incidental take statement." (emphasis added)). The

Forest Service responded that it has no duty to do what the regulation requires. ECF 94-6 at 12. It

also responded it has no such reports. *Id*. Although "actual knowledge" is not required for a

statutory period to commence, *Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362, 1364 (9th

Cir. 1990), Federal Defendants never published anything in the Federal Register or otherwise

gave Guardians "legally sufficient notice" the zero-limit on take in the ITS was exceeded. *Cf.*

*Hells Canyon Preservation Council v. USFS*, 593 F.3d 923, 931 (9th Cir. 2010) (claim against

agency boundary change time-barred based on when agency published Federal Register notice).

---

[1] Idaho and Wyoming are wrong because Guardians do not challenge the National Policy. *Cf.*
ECF 56 at 21. Wyoming also asserts the BiOp is not justiciable because it is no longer final
agency action. WY Br. 11–12, 13, 14. As explained below, the BiOp applies to the National
Policy because both the Forest Service and FWS relied on it to satisfy their duty to consult on the
National Policy under Section 7, so it remains the consummation of the agency decisionmaking
from which legal consequences flow and, therefore, final agency action. *Bennett v. Spear*, 520
U.S. 154, 177–78 (1997).

Finally, even if Guardians' reinitiation claim might otherwise be time-barred, in June 2020, Federal Defendants considered whether reinitiation of consultation was required and decided it was not. FWS AR 298. Federal Defendants concede their decision constitutes "new, final agency action under the APA," Ds' Br. 22, which therefore restarts any clock on Guardians' reinitiation claim. *See Peavey v. United States*, 128 F. Supp. 85, 100 (D.D.C. 2015) (agency review of servicemember's request for benefits reopened case, and constituted new and final agency action from which new statute of limitations period runs).

Argument.

A.     <u>The BiOp Applies to the National Policy</u>.

Federal Defendants assert there is no connection between the BiOp and the National Policy. Ds' Br. 7. The record proves otherwise. Again, in 1993, the Rocky Mountain and Intermountain Region regional foresters made it plain they (a) needed to consult on the effects of the National Policy and (b) requested that FWS concur with the Forest Service's finding that the Policy "may affect/not likely to adversely" affect grizzlies based on the existence and continued viability of the BiOp. They wrote the Chief: "Should the National Policy permit the continuation of black bear baiting, we will re-establish the closure orders related to grizzly bear habitat in accordance with the mitigation measures in the Decision Notice and non-discretionary measures in the Biological Opinion issued by the Fish and Wildlife Service. That part of the environmental analysis process and Decision Notice that relates to grizzly bear habitat, the Biological Evaluation, and Biological Opinion will be re-instated [*sic*] and considered adequate to protect" grizzlies. FS AR 130.[2]

---

2     The record thus also rebuts Federal Defendants' assertion that the BiOp could not remain in effect because the Region 2 policy was intended to be temporary. *See* Ds' Br. 23–24. The record proves both agencies anticipated and intended that the BiOp outlive the Region 2 policy, that it

Accordingly, when the Forest Service sought FWS's concurrence that the National Policy is not likely to adversely affect grizzlies under Section 7, it wrote:

> In reviewing the [1995 Biological Evaluation], [BiOp], state regulations on baiting, and the closure orders, it is our opinion that the National Policy, when issued, would not change the conditions or situations that were present when the original [BiOp] was issued. We plan to continue with the closure orders that are in place and will work with the Wyoming Game and Fish Department if changes in their regulations on baiting are proposed. We ask that you review the original [BiOp] in light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate.

FWS AR 164. Notably, the Forest Service asked FWS to concur that the actions it had taken to protect grizzlies "are *still* adequate." *Id*. (emphasis added). In that respect, it explicitly asked FWS to review two mitigation measures in the BiOp, in addition to new closure orders on baiting in the grizzly recovery area. *Id*. FWS responded by reciting the Forest Service's affirmative actions related to baiting and grizzlies since 1993, FWS AR 165, and concluded: "The proposed National Policy appears to be consistent with our biological opinion of April 13, 1993, and no information has become available to suggest that *additional* terms and conditions are necessary at this time." FWS AR 166 (emphasis added). Because FWS determined that terms and conditions in addition to those specified in the BiOp and ITS were unnecessary "at this time," FWS concurred with the Forest Service's finding that the National Policy "is not likely to adversely affect" grizzlies. FWS AR 167.

Importantly, "terms and conditions" is a term of art under the ESA, referring to mandatory requirements in an ITS that a federal action agency must comply with to be immune from Section 9 liability. 16 U.S.C. § 1536(b)(4)(C)(iv). FWS may not impose terms and conditions unless an ITS is required under the ESA. *Ariz. Cattle Growers' Ass'n v. FWS*, 273

---

extend forward to cover the National Policy, and in fact used the BiOp as a basis for consultation on the National Policy.

F.3d 1229, 1239, 1244, 1246 (9th Cir. 2001). FWS would have had no reason or legal basis to consider whether the existing terms and conditions in the ITS were sufficient, or whether additional terms and conditions may be required to mitigate for take due to the National Policy, if, as Federal Defendants assert, the BiOp and ITS were inoperative or no longer required.

Finally, when the Forest Service released its EA evaluating the environmental effects of the National Policy, it attached the BiOp to it, noting what the regional foresters had written: the BiOp will be "re-evaluated" to ensure it is "still applicable under the new policy." FS AR 189.

Federal Defendants assert that FWS's concurrence on the National Policy and agreement that no additional terms or conditions were necessary "is consistent with its LOC that the National Policy was, itself, 'not likely to adversely affect.'" Ds' Br. 25. But the plain reason FWS concurred is that it found the existing BiOp, including the terms and conditions in the ITS, to be sufficient at that time to prevent jeopardy to grizzlies. Nowhere in the record from the time did either agency determine that the National policy was "'not likely to adversely affect' the grizzly bear *on the grounds that it merely maintained the status quo*." *Contra* Ds' Br. 7 (emphasis added). This is an impermissible post hoc rationalization advanced by litigation counsel. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (citation omitted). Rather, the record proves the Forest Service found and FWS concurred that the National Policy was "not likely to adversely affect" grizzlies because the Forest Service had implemented mitigation specified in the 1993 EA (closure orders), and because the BiOp and ITS provided sideboards in the form of further non-discretionary terms and conditions anticipated to prevent jeopardy to grizzlies. FS AR 207; FWS AR 167.

B.     The National Policy is "Agency Action" under Section 7 of the ESA.

In June 2020, the Forest Service stated twice why it sought to rescind the BiOp: it

considers the National Policy to be a "policy statement" that "constituted Agency inaction

(unexercised discretion), as the District of Columbia Circuit Court of Appeals suggested, that did

not require ESA consultation." FWS AR 295 (citing *Fund for Animals, Inc. v. Thomas*, 127 F.3d

80 nn. 3 & 6 (D.C. Cir. 1997)); *see also id*. ("Agency inaction is not a basis for ESA consultation

in the first instance, or for reinitiation of consultation."). That presents a primary issue in this

case: is the National Policy "agency action" under Section 7 of the ESA, or is it "[a]gency

inaction (unexercised discretion)," as defendants assert. *See* Ds' Br. 18–20; ID Br. 16 n.13; FWS

AR 295, 297.

Two inquiries determine whether "agency action" existed under the Section 7. First,

"whether [the] federal agency affirmatively authorized, funded, or carried out the underlying

activity[.]" *Karuk Tribe of Cal. v. USFS*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc). Second,

"whether the agency had some discretion to influence or change the activity for the benefit of a

protected species." *Id*. In *Karuk Tribe*, the Ninth Circuit found "little doubt that Congress

intended agency action to have a broad definition," holding that agency action exists "whenever

an agency makes an affirmative, discretionary decision about whether, or under what conditions,

to allow private activity to proceed." *Id*. at 1011, 1020, 1030.

As Guardians established in their opening brief, ECF 93-1 at 13–17, the 1995 Biological

Evaluation ("BE") and BiOp are tethered to affirmative, discretionary agency action. Idaho

asserts the National Policy is somehow merely a continuation of an uninterrupted and centuries-

old approach of deference to states in matters concerning hunting, ID Br. 1; but the National

Policy is actually the culmination of a period of regulatory actions concerning baiting and grizzly

bears that the Forest Service in its BE found "will *increase* the ability to protect [ESA species] habitat values on [Forest Service] lands if conflicts with baiting activities are identified." FS AR 207.[3] For instance, when the Forest Service in 1992 ended its policy of requiring hunters obtain special use permits in order to use bait, and instead issued closure orders that prohibited baiting except where allowed, baiting was authorized for some where it had not been before, and prohibited elsewhere where it previously had not been. FS AR 163; *Use of Bait in Hunting*, 59 Fed. Reg. 11,765, 11,766 (Mar. 14, 1994).

Even if the National Policy set a policy of pure inaction—which it did not—its adoption would still represent agency action because it formally ended the Forest Service's practice of issuing special use permits for baiting, thus authorizing an activity to persons and in places where it was previously at times restricted. *See* 50 C.F.R. § 402.02 (defining "action" as "all activities or programs of any kind authorized . . . or carried out, in whole or in part, by Federal agencies"). That this constitutes "agency action" follows from the statutory and regulatory scheme of the ESA. For true ongoing and uninterrupted federal inaction, there would not be any effect on listed species, no risk of jeopardy or adverse modification of critical habitat, and nothing to consult on. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g). But where an agency adopts a policy deregulating an activity it previously regulated, and assumes a supervisory role, it effectively authorizes that activity moving forward, which "may affect" listed species. *Cf. Ctr. for Food Safety v. Vilsack*, No. C 08-00484-JSW, 2009 WL 3047227 *8–9 (N.D. Cal. Sept. 21, 2009) (federal "deregulation" of genetically engineered sugar beets was a federal "action" under

---

[3]   In their opening brief, Guardians misstated which states currently allow bait to hunt black bears: Idaho, Alaska, Arkansas, Maine, Michigan, Minnesota, New Hampshire, Oklahoma, Utah, Wisconsin and Wyoming do. FWS AR 00289. Idaho and Wyoming are the only two states in the lower forty-eight where bait is used to hunt black bears in grizzly bear habitat.

NEPA). Put differently, here, the Forest Service's earlier practice of requiring special use permits constitutes part of the environmental baseline, with respect to which the National Policy is an action that may affect grizzlies. 50 C.F.R. §§ 402.02, 402.14(g).

Because the National Policy calls for further federal action, it does not merely set a policy of inaction. *Contra* WY Br. 15. The National Policy "provides for Federal action if State regulations do not protect Federal interests." *Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14,721 (Mar. 20, 1995). "If State regulations are adequate to protect grizzly bears or any other threatened or endangered species, no action is *needed* by the Forest Service." *Id*. at 14,722 (emphasis added). In other words, if state regulations are *not* adequate to protect grizzly bears, then *action by the Forest Service is needed*. Specifically, the Forest Service will monitor for grizzly mortalities and continue to issue needed closure orders or other measures to "protect Federal interests." *Id*. at 14,721. The Forest Service will "determine[] on a site-specific basis that there is a need to prohibit or restrict" baiting. *Id*. at 14,723. And Forest Service staff "*must* close an area to baiting" if certain events occur, including conflicts with laws "such as the Endangered Species Act." *Id*. at 14,721 (emphasis added). The 1995 EA confirms these duties, stating that the national bait policy "*mandates* corrective action through cooperative effort with the States or *through Federal action*." FS AR 170 (emphases added). Therefore, contrary to Federal Defendants' assertion, D's Br. 10, the National Policy does require further action to implement.

Wyoming notes the National Policy does not "in and of itself . . . compel an authorized officer to undertake a *specific* decision to allow baiting on National Forest System Lands." WY Br. 15 (citing FS AR 154) (emphasis added). But the National Policy plainly authorizes and charges Forest Service staff with monitoring state allowance of bait on national forests, determining whether state regulations are adequate, and taking appropriate action if not. 60 Fed.

Reg. 14,720, 14,723. The fact that Forest Service staff have discretion in determining what specific actions are appropriate to take does not make the National Policy less than "agency action." *Contra* WY Br. 16. By way of comparison, a federal land management plan (like a forest plan) is also steeped in agency discretion, setting out "a statement of priorities . . . [that] guides and constrains actions, but does not (at least in the usual case) prescribe them." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 70 (2004). And yet the Ninth Circuit has squarely held that these same plans constitute agency action under Section 7 and require consultation. *Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075, 1087 (9th Cir. 2015), *cert denied*, 137 S.Ct. 293 (2016); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053–54 (9th Cir. 1994); *see also Envtl. Prot. Info. Ctr. v. FWS*, No. C 04-04647-CRB, 2005 WL 3021939 *5 & *7 (N.D. Cal. Nov. 10, 2005) (adaptive management plan directing federal agencies to review, consult, and approve, deny, or direct modifications for activities near occupied habitat to minimize disturbances was "action" under the ESA).

      Federal Defendants continue to rely on what the Court correctly characterized as "dicta" in *Fund for Animals*. Ds' Br. 15–17; ECF 55 at 8. They say it is "persuasive and telling" that the D.C. Circuit suggested the National Policy "may not constitute 'action' at all." Ds' Br. 16 (quoting *Fund for Animals*, 127 F.3d at 83, n.3). But the D.C. Circuit assumed without deciding that the National Policy *did* constitute "action" under both NEPA and the ESA, "because it implements the existing federal policy of leaving baiting regulation to individual states that have adopted adequate regulatory provisions." *Fund for Animals*, 127 F.3d at 83. The D.C. Circuit found that "[t]o the extent that there was an ESA consultation obligation, the Forest Service and FWS fulfilled it by engaging in 'informal consultation[.]'" *Id*. at 84. Guardians "have little to

say" about *Fund for Animals*, Ds' Br. 17, because the only possibly relevant statements in it are ambiguous dicta at best.

All defendants continue to rely on *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006)—Ds' Br. 18, WY Br. 19, ID Br. 13–14—which Guardians distinguished in its opening brief. ECF 93-1 at 17. There, BLM's long-standing "acquiescence" to stream diversions on its lands—without adopting any policy concerning the diversions, assuming the roles of monitoring them, adopting mitigation measures for them, or choosing to regulate them if they harmed federal resources (including ESA-listed species)—is completely different from the National Policy. *Compare Matejko*, 468 F.3d at 1103–09.[4]

Idaho asserts that "in attempting to distinguish *Matejko*, Guardians make the exact same error that the lower court made in *Matejko*, by arguing the Forest Service's ongoing decision to not exercise its closure authority somehow constitutes action." ID Br. 13. Idaho appears to misunderstand Guardians' argument and confuse the "agency action" requirement for initial consultation with the "discretionary involvement or control" requirement for reinitiation of consultation. Guardians do not "argue that the National Policy consultation must be reinitiated because of Forest Service closure orders." Ds' Br. 1. Nor does Guardians' "entire case rel[y] on the premise that the United States Forest Service's 1993 Wyoming black bear baiting policy constitutes an ongoing 'agency action' that triggers" the duty to consult. WY Br. 1. Rather, the National Policy constitutes agency action triggering the consultation requirement, which was fulfilled, and reinitiation is required now because (1) the Forest Service retains authority to

---

[4]   Federal Defendants assert Guardians "mischaracterize [*Matejko*] as involving mere agency 'acquiescence' to water diversions." Ds' Br. 20. "[A]cquiescence" is the word the Ninth Circuit used to describe what the plaintiffs in that case challenged. *Matejko*, 468 F.3d at 1103.

exercise "discretionary . . . involvement or control" over any baiting in national forests, 50

C.F.R. § 402.16(a), and (2) the extent of grizzly taking in the ITS—zero—has been exceeded. *Id*.

at § 402.16(a)(1).[5] Moreover, (3) the unanticipated amount of take also constitutes "new

information" that reveals effects of the policy on grizzly bears "to an extent not previously

considered." *Id*. at § 402.16(a)(2).

   *Matejko* concerned the requirement to *initiate* consultation in the first instance, not the

requirement to *reinitiate* consultation after consultation had been performed. With respect to

initiation of consultation, it is indeed "well established that section 7 of the ESA requires

affirmative federal action, and a mere failure to exercise discretion alone is insufficient to trigger

consultation." ID Br. 13–14; *see Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1091 (9th

Cir. 2017) ("The retention of discretionary control is necessary but insufficient to trigger an

agency's duty to . . . *initiate* consultation.") (emphasis added). However, as the Ninth Circuit has

held, "[a]n agency's responsibility to reinitiate consultation does not terminate when the

underlying action is complete. Stated another way, there is nothing in the ESA or its

implementing regulations that limits reinitiation to situations where there is 'ongoing agency

action.'" *Cottonwood*, 789 F.3d at 1086. Therefore, in the reinitiation context, "the appropriate

test is not whether the agency has completed its action, but whether it retains regulatory authority

over the action." *Id*. at 1087. *Ctr. for Biological Diversity* is in accord. *Contra* WY Br. 16, n.13.

Citing *Cottonwood*, the Ninth Circuit in that case reaffirmed that Section 7 consultation is

---

[5]   Federal Defendants now assert that two of the three reported grizzly bear mortalities at bait
sites in Wyoming did not occur on Forest Service lands, ECF 104-1 (citing FS AR 1668), even
though Wyoming still admits they did. ECF 106 at 2 #s 28 & 29. However, these defendants'
disagreement is not material as to whether at least one grizzly has been taken by a black bear
hunter using bait on national forest lands since 1995 and, therefore, the zero-take limit in the ITS
has been exceeded.

initially triggered by affirmative agency action, but "[a]n agency's duty to consult, or to reinitiate consultation, applies whether an agency action is 'ongoing' or 'complete.'" *Ctr. for Biological Diversity*, 847 F.3d at 1084.

Here, the BiOp and 1995 BE were predicated on agency action, and Guardians need not show ongoing agency action in order to prevail on their reinitiation claim. Nor have Guardians argued that the Forest Service's "ongoing decision to not exercise its closure authority somehow constitutes action." *Contra* ID Br. 13. If anything, the Forest Service's failure to issue sufficient closure orders consistent with its authority to under the National Policy is an independent reason why reinitiation is required. *See Forest Guardians v. Johanns*, 450 F.3d 455, 463 (9th Cir. 2006) (agency's failure to carry out parts of the action consulted on in a BiOp constituted a subsequent modification to the action, triggering duty to reinitiate consultation).

C.   The National Policy Remains in Effect.

No defendant asserts the National Policy has been rescinded.[6] Nor do Federal Defendants successfully prove the National Policy has not been periodically implemented since it was adopted. Guardians have already described the closure orders implementing the National Policy, ECF 93-1 at 15–17, which Federal Defendants admit "restricted or prohibited bear baiting when they were in effect," Ds' Br. 1, just as the National Policy calls for. 60 Fed. Reg. at 14,720.

---

[6]   Federal Defendants assert the National Policy is not a rule because it does not use that word. Ds' Br. 6, n.2. The APA does not define a "rule" by how a document is labeled but instead as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4). The National Policy is a rule because it is an agency statement of general applicability and future effect designed to prescribe policy. Federal Defendants are also wrong speculating the National Policy was adopted via notice-and-comment due to a forest planning statute; in fact, it was due to the parties' stipulation in the case challenging, among other things, the absence of public comment on the interim policy. *See Use of Bait in Hunting*, 59 Fed. Reg. 17,758, 17,759 (Apr. 14, 1994).

Guardians have also described food storage orders implementing the National Policy, including those the Forest Service asserted at the time were implemented "[a]s a result of . . . the reasonable and prudent alternatives in the [BiOp.]" FWS AR 164. A Forest Service document in the record states:

> ***How do the food storage order exceptions geographically align with the areas in ID and WY that allow/prohibit baiting?*** Food storage orders are in place across national forests within most areas of ID and WY that are occupied by grizzly bears. However, the exemptions in these food storage orders allow black bear baiting anywhere it is allowed by State regulation.

FS AR 1474. The record proves and Federal Defendants do not contest that the Forest Service has issued numerous food storage closure orders in national forests in Idaho and Wyoming to ameliorate conflicts between humans and grizzlies, but also chose to exempt baiting where the states allow it. FS AR 1097–98; FS AR 1326–31, Plfs' Ex. F, Ds' Disc. Responses at 7, #11; FS AR 1099–1103, Plfs' Ex. F, Ds' Disc. Responses at 6, #8.[7] Nonetheless, the Forest Service asserts that its choices to exempt baiting are not traceable or due to the National Policy. Ds' Br. 10. However, in discovery, when Guardians asked for the legal bases for the Forest Service's decision to issue food storage closure orders but exempt baiting, Federal Defendants admitted that line officers have discretion whether to make exemptions, and that "[t]he directive at Forest Service Manual 2643.12 codifies the status quo of the use of bait for resident game hunting policy while clarifying that the 'authorized officer [may determine] on a site-specific basis that there is a need to prohibit or restrict the practice,' and gives considerations to assist the line officer in making that determination." ECF 94-6 at 10. The directive at Forest Service Manual 2643.12 *is* the National Policy. FWS AR 293 ("This nationwide policy is contained in Forest

---

[7]   There are other current and lapsed orders and exemptions. FS AR 1320–35, Plfs' Ex. F, Ds' Disc. Responses at 6 & 7, #10 (food closure order and baiting exemption in the Bridger-Teton National Forest in Wyoming); FS AR 1356–62.

Service Manual 2643.12."). The line officers that decided to issue food storage orders, but exempted baiting, used the considerations in the policy to make their decisions.

Federal Defendants argue that the closure and food storage orders are irrelevant because they are not agency action, and do not authorize, fund, or carry out bear baiting, and do not cause take of grizzly bears but rather have beneficial effects on the species. Ds' Br. 17, 26. Guardians has never asserted these orders "authorize, fund, or carry out bear baiting, or cause the take of grizzly bears." *Contra* Ds' Br. 17. Nor does it matter whether the orders may have worked to benefit grizzlies; agency action under the ESA includes "actions intended to conserve listed species or their habitat." 50 C.F.R. § 402.02; *Karuk Tribe*, 681 F.3d at 1027 ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character," triggers the duty to consult under Section 7). Nor are these orders essential to Guardians' reinitiation claim, because ongoing agency action is not a requirement. *Cottonwood*, 789 F.3d at 1086 ("there is nothing in the ESA or its implementing regulations that limits reinitiation to situations where there is 'ongoing agency action'"). These orders matter in this case to the extent they show the National Policy has been implemented over the intervening years, rebutting the last of the Federal Defendants' unlawful rationales for seeking to rescind the BiOp. FWS AR 295, 297 (describing the National Policy as "unexercised discretion").

D.   Federal Defendants' June 2020 Actions Were Unlawful.

Because the National Policy is agency action, because the BiOp and ITS were part of consultation on Policy, and because the Policy has been implemented, Federal Defendants' rationales for seeking to rescind the BiOp and Letter of Concurrence are legally and factually

wrong, arbitrary, capricious, and not in accordance with law.[8] FWS AR 293–95 & 297; 5 U.S.C.

§ 706(2)(A). At the outset, in June 2020, Federal Defendants cited no statutory or regulatory

authority to seek to rescind the BiOp. *See* FWS AR 297–98. However, in their summary

judgment briefs, they rely on *Defs. of Wildlife v. Flowers*, No. CIV 02-195-TUC-CKJ, 2003 WL

22145708 (D. Ariz. Aug. 18, 2003), for the proposition that "where a BiOp has been issued in

the absence of federal action, it may be withdrawn." Ds' Br. 5. As explained above, the BiOp

was not issued in the absence of federal action. Moreover, *Flowers* is distinguishable. There, a

privately-owned ranch sought coverage under an EPA general permit for stormwater, which in

turn obligated EPA to consult with FWS, who prepared a BiOp. *Flowers*, 2003 WL 22145708 at

\*1. However, the ranch never submitted a formal request to EPA to be covered by its general

permit, and instead asked Arizona for a state permit after EPA decided to transfer permitting

authority to Arizona. *Id*. at \*1–2. Because the ranch did not seek the federal permit, EPA never

completed any agency action under Section 7, so FWS withdrew its BiOp. *Id*. at \*2. Here, by

contrast, the Forest Service took a different but similar action from the action on which it

originally sought formal consultation, and then through informal consultation sought and

obtained FWS's concurrence that the BiOp remained valid for the action ultimately it took:

adopting the National Policy. Because the policy remains in effect, Section 7 still applies, and the

BiOp and 1995 BE and Letter of Concurrence cannot be rescinded until they are replaced with

new consultation documents through lawful reinitiation of consultation.

---

[8]   Federal Defendants now recast their June 2020 actions as a "Reinitiation Decision." *Compare* Ds' Br. 1, *with* ECF 38-1 at 7 *and* FWS AR 293–96 & 297–98. However, their recasting of that decision in the course of litigation does not affect the standard or scope of review for Guardians' reinitiation claim, which remains a challenge to agency inaction properly reviewable under the standard of review set forth at 5 U.S.C. § 706(1). *Friends of the Clearwater*, 2021 WL 3408595 at \*4.

Moreover, Federal Defendants misrepresent the Supreme Court's decision in *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). The Supreme Court did not discuss the BiOp at issue in *Flowers*, nor affirm its withdrawal. *Home Builders* concerned EPA's decision to transfer pollution permitting authority to Arizona, and a different BiOp FWS prepared concerning *that* decision. *Compare* Ds' Br. 6; *Home Builders*, 551 U.S. at 654. FWS did not withdraw that BiOp—the Supreme Court vacated it after determining EPA did not retain discretionary control over its decision to transfer permitting authority to a state when the statutory requirements were met for the transfer. *Id*. at 671–72. The part of the Supreme Court's opinion Federal Defendants cites concerns EPA changing its views during its review of Arizona's application for permit authority, over whether it was required to consider effects on ESA-listed species when the statutory requirements for transfer are met. *Compare id*. at 658–59; *with* Ds' Br. 5. Thus, the "proper procedures" the Supreme Court stated must be followed refer to those APA procedures EPA must follow when transferring permitting authority to a state—not procedures agencies must follow to lawfully withdraw a BiOp.

While the Forest Service and FWS may be entitled to "'change[] their minds' about whether the National Policy is a federal action that requires ESA Section 7 consultation," Ds' Br. 13 (quoting *Home Builders*, 551 U.S. at 658–59), they must follow the "proper procedures" for withdrawing a BiOp. Federal Defendants previously cited 50 C.F.R. §§ 402.14(m)(2) & (m)(3) as authority for their actions in June 2020, in their July 17, 2020 brief in support of their second motion to dismiss. ECF 38-1 at 3. But those regulations concern "termination of consultation," which occurs automatically when a BiOp is issued. 50 C.F.R. § 402.14(m)(1). Thus, once a BiOp is issued, the BiOp may not later be rescinded by "terminating" it a second time under those provisions. *Interagency Cooperation - Endangered Species Act*, 51 Fed. Reg. 19,926, 19,935

(June 3, 1986). Instead, as the two agencies that administer the ESA stated in the Federal Register: "If revisions to the opinion are necessary, consultation can be reinitiated and a revised opinion issued." *Id*.

E.       Federal Defendants Must Reinitiate Consultation.

Even though the National Policy "is more than two and a half decades old"—and even if "all that remains [now] is mere unexercised discretion on the part of the Forest Service to regulate conduct on federal land," WY Br. 16, n.13—reinitiation of consultation is required by law. Defendants assert however that reinitiation of consultation is not required because baiting is a private non-federal activity, and the remedy for private violations of the ESA is under Section 9. Ds' Br. 21; WY Br. 20; *see* 16 U.S.C. §§ 1538(a)(1)(B) & (g). But Guardians is not challenging substantive violations of the ESA resulting from the actions of private hunters; it is challenging Federal Defendants' procedural violation of failing to reinitiate consultation on the National Policy. Correctly framed, this is not a "wholly private" action. Though private actions are the direct cause of the incidental take exceedances, the salient legal violation—failure to reinitiate consultation as required by the ITS—is *wholly federal*.

Federal Defendants contend that "a causal linkage between [Forest Service] authorization and take of grizzly bears by private individuals hunting black bears using bait is entirely missing here." Ds' Br. 26. As a threshold matter, FWS devised the ITS that requires reinitiation of consultation precisely because of the possibility that "a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming." FWS AR 7. As *Ariz. Cattle Growers*' makes clear, it is the consulting agency's obligation to devise an ITS that complies with the ESA. *Ariz. Cattle Growers'*, 273 F.3d at 1250. FWS should not be allowed to renege on its duty to

ensure the still-effective National Policy on baiting does not jeopardize grizzly bears, by attacking its own ITS in litigation.

More to the point, unlike challenges to "take" violations under Section 9—*see Strahan v. Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997); *Seattle Audubon v. Sutherland*, No. CV06–1608MJP, 2007 WL 1300964 *8 (W.D. Wash. May 1, 2007)—a plaintiff challenging a federal agency's failure to reinitiate consultation where an ITS is exceeded is not required to prove the defendant caused "take." Rather, "[i]f the specified impact on the species is exceeded," Congress "expects that the Federal agency or permittee or licensee will *immediately* reinitiate consultation since the level of taking exceeds the impact specified in the initial Section 7(b)(4) statement." *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) (quoting H.R. Rep. No. 97–567, at 27 (1982)).

The "causal link" test described in *Ariz. Cattle Growers*' does not require, or concern, determining after the fact whether a federal agency "caused" an exceedance of an ITS. Instead, it is used to ensure that, where it is not practical to express actual numerical incidental take, the consulting agency select a take surrogate with a sufficient causal link to the taking of the species to "establish a measure of the impact on the species or its habitat and provide the yardstick for reinitiation." *Ariz. Cattle Growers'*, 273 F.3d at 1250 (quoting ESA Section 7 Consultation Handbook, March 1988 at 4–47 to 4–48). The ITS FWS prepared here—more than 25 years ago—does not use a take surrogate. Nor is the regulatory definition of "effects of the action," and its corollary "but for" test, relevant here. *See* Ds' Br. 26. That test is used during consultation to define the "effects of the action," that are then added to the cumulative effects and environmental baseline in order to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat. 50 C.F.R. §§ 402.02, 402.14(g)(4).

To require Guardians to prove that the Forest Service's actions caused the instances of grizzly mortality would erode important differences between Sections 7 and 9 of the ESA, effectively turning every incidental take-based reinitiation claim into a much more factually-intensive Section 9 "take" claim. The Ninth Circuit has rejected interpretations of ITSs that would undermine their rapid "trigger" function, which represents a core procedural safeguard for ensuring federal agencies comply with Section 7. *Allen*, 476 F.3d at 1040; *see also Oceana v. Pritzker*, 75 F. Supp. 3d 469, 498–99 (D.D.C. 2014) (an ITS that fails to expeditiously detect exceedances and trigger reinitiation of consultation "stands in marked tension with the regulatory requirement that [the agency] reinitiate Section 7 consultation 'immediately' if 'during the course of the action the amount or extent of incidental taking . . . is exceeded'").

F.   The Relief Guardians Request is Warranted under the ESA.

For relief, Guardians has respectfully asked the Court to declare unlawful and vacate Federal Defendants' purported rescission of the BiOp; order them to reinitiate consultation as to the effects of the National Policy; and order the Forest Service to close to baiting the same areas where it has issued food storage closure orders to prevent interactions between humans and grizzly bears but exempted baiting, do not prohibit it during all of the black bear hunting season, or otherwise do not prohibit it where grizzlies may be present. ECF 93-1 at 19–20.

As to the first request, if the Court rules the purported rescission of the BiOp is unlawful, under the APA, vacatur is "the normal remedy for unlawful agency action." *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007).

As to the second request, it is mandated by the ITS and by Federal Defendants' own regulations. The ITS provides: "Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." FWS AR

80. Separately, the Ninth Circuit has held that "[t]he agency must immediately reinitiate consultation with the FWS if the amount or extent of incidental taking is exceeded." *Allen*, 476 F.3d at 1034–35 (citing 50 C.F.R. 402.14(i)(4)).[9]

As to the third request, the Forest Service admits it closed areas to food storage to ameliorate conflicts between humans and grizzlies but exempted baiting. FS AR 1097–98; FS AR 1326–31, Plfs' Ex. F, Ds' Disc. Responses at 7, #11; FS AR 1099–1103, Plfs' Ex. F, Ds' Disc. Responses at 6, #8. It is undisputed FWS has found that "[t]he primary factors affecting grizzly bears at both the individual and ecosystem levels are excessive human-caused mortality and human activity that reduces the quality and quantity habitats, which increases the potential for human-caused mortality, both directly and indirectly," and that hunting over bait "can be a source of mortality (due to mistaken identity killings) and conflicts (due to conditioning to human foods)." Plfs' Ex. B at 7 & 128. Guardians' third request is justified by facts and the law. The states allow baiting in significant grizzly habitat. FS AR 1473 ("grizzly distribution extends well beyond the [primary conservation area] into areas of ID where baiting is allowed."); *id.* ("there are significant areas within occupied grizzly bear range [in Wyoming] where baiting is allowed"); Declaration of Dave Stricklan ¶ 17 (grizzly sow and cub in bait hunt unit in Idaho). Proving the prospect of irreparable harm under the ESA should not be "onerous," *Cottonwood*, 789 F.3d at 1091, and "the threat of death to individual grizzly bears . . . is sufficient" to establish it. *Crow Indian Tribe v. United States*, No. 17-v-89-M-DLC, 2018 WL 4145908, at *1 (D. Mont. Aug. 30, 2018). The Court need not await another killing of a grizzly at a bait between the GYE, NCDE, and Bitterroot this fall or next spring, to grant Guardians' request for relief for

---

[9]   Guardians has also proven that new information reveals effects of the National Policy that was not considered in the BiOp. ECF 93-1,18–19; *see Friends of the Clearwater*, 2021 WL 3408595 at *6–7, 11 (ordering agencies to reinitiate consultation upon finding new information).

a pause in continued baiting for the period before Federal Defendants complete (reinitiated) consultation. *See* Plfs' Ex. D (FWS map of grizzly distribution).

Conclusion.

The Court should grant Guardians' motion for summary judgment and injunctive relief.

Date: August 1, 2022.                              Respectfully submitted,

                                                   /s/ Sangye Ince-Johannsen
                                                   Sangye Ince-Johannsen, *pro hac vice*
                                                   Peter M. K. Frost, *pro hac vice*
                                                   Matthew K. Bishop, *pro hac vice*
                                                   Dana M. Johnson, Idaho Bar #8359
                                                   120 Shelton McMurphey Blvd, Suite 340
                                                   Eugene, OR 97401

                                                   Attorneys for Plaintiffs