Sangye Ince-Johannsen, OSB # 193827
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, Oregon, 97401
sangyeij@westernlaw.org
541-778-6606

Nicholas S. Cady, OSB # 113463
CASCADIA WILDLANDS
P.O. Box 10455
Eugene, Oregon, 97440
nick@cascwild.org
541-434-1463

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation, | Case No.: 6:22-cv-00767-AA |
| *Plaintiff*, | **PLAINTIFF'S MOTION AND MEMO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | Oral argument requested. |
| **CHERYL ADCOCK**, in their official capacity as Field Manager of the Siuslaw Field Office, Northwest Oregon District BLM; | |
| **PAUL TIGAN**, in their official capacity as Field Manager of the Mary's Peak Field Office, Northwest Oregon District BLM; and the | |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, an administrative agency of the United States Department of Interior, | |
| *Defendants, and* | |
| **AMERICAN FOREST RESOURCE COUNCIL**, an Oregon non-profit corporation, | |
| *Defendant-Intervenor.* | |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

TABLE OF ACRONYMS ....................................................................................................... vi

MOTION .................................................................................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION ..................................................................... 2

    I.      Introduction ......................................................................................................... 2

    II.     Jurisdiction .......................................................................................................... 3

    III.    Standard of Review .............................................................................................. 4

    IV.    Legal Background ................................................................................................ 5

    V.     Factual Background ............................................................................................. 7

        A.  2016 Northwestern and Coastal Oregon Record of Decision and
            Resource Management Plan. ......................................................................... 7

        B.  N126 LSR Landscape Plan Project. ............................................................. 9

           1.   The Pucker Up Density Management Project DNA ............................... 10

           2.   The Gone Fishin' Density Management Project DNA. ........................... 11

    VI.    Argument ............................................................................................................ 12

        A.  BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the
           N126 Project and failed to conduct the required site-specific analysis in violation of
           NEPA. ........................................................................................................ 12

           1.   BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the
               N126 Project on northern spotted owl recovery. ................................. 15

           2.   BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the
               N126 Project on sedimentation and failure to conduct site-specific analysis. ............. 16

           3.   BLM failed to consider the cumulative impacts of the N126 Project with other past,
               present, and reasonably foreseeable actions ........................................ 18

        B.  BLM unlawfully failed to prepare an EIS ................................................... 24

       1.   The N126 Project will impact ESA-listed species and designated critical habitat. ..... 25

       2.   The N126 Project area contains unique characteristics. ................................................ 28

       3.   An EIS is required to fully evaluate effects including cumulatively significant effects. ........................................................................................................................................ 30

VII.    Conclusion ......................................................................................................................................... 31

CERTIFICATE OF COMPLIANCE ..................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Anaheim Mem'l Hosp. v. Shalala,*
    130 F.3d 845 (9th Cir. 1997) ................................................................................................. 5

*Ariz. Cattle Growers' Ass'n v. FWS,*
    273 F.3d 1299 (9th Cir. 2001) .............................................................................................. 5

*Arrington v. Daniels,*
    516 F.3d 1106 (9th Cir. 2008) .............................................................................................. 4

*Blue Mtns. Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998) ...........................................................................4, 16, 24, 26

*Cascadia Wildlands v. BLM ("Thurston I"),*
    410 F. Supp. 3d 1146 (D. Or. 2019) ...................................................................... 14, 17, 27

*Cascadia Wildlands v. U.S. Forest Serv.,*
    937 F. Supp. 2d 1271 (D. Or. 2012) ...................................................................... 25, 28, 29

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) ........................................................................................15, 25

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................................................... 5

*Envtl. Prot. Info. Ctr. v. Blackwell,*
    No. S-04-1027-WBS-GGH, 2005 WL 8176926 (E.D. Cal. 2005) ........................................28, 29

*Great Basin Resource Watch v. BLM,*
    844 F.3d 1095 (9th Cir. 2016) ............................................................................................ 13

*'Ilio'ulaokalani Coal. v. Rumsfeld,*
    464 F.3d 1083 (9th Cir. 2006) ........................................................................................26, 31

*Kern v. BLM,*
    284 F.3d 1062 (9th Cir. 2022) .................................................................................. 18, 24, 31

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
    387 F.3d 989 (9th Cir. 2004) .................................................................................... 16, 18, 21

*Klamath-Siskiyou Wildlands Ctr. v. Boody,*
    468 F.3d 549 (9th Cir. 2006) .............................................................................................. 24

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.,*
    99 F. Supp. 3d 1033, 1041 (N.D. Cal. 2015) ..................................................................... 17

*Lands Council v. McNair ("Lands Council II"),*
    537 F.3d 981 (9th Cir. 2008) ................................................................................................ 4

*Lands Council v. Powell ("Lands Council I"),*
    395 F.3d 1019 (9th Cir. 2005) ................................................................................... 6, 19, 20

*Mack v. S. Bay Beer Distribs., Inc.,*
    798 F.2d 1279 (9th Cir. 1986) ............................................................................................ 19

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ................................................................................ 4

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) ............................................................................ 21

*Ocean Advocates v. Army Corps of Eng'r*s,
    361 F. 3d 1108 (9th Cir. 2004) ................................................................ 18, 21, 30

*Or. Nat. Desert Ass'n v. BLM,*
    625 F.3d 1092, 1100 (9th Cir. 2010) ............................................................. 12, 26

*Or. Nat. Desert Ass'n v. Jewell,*
    840 F.3d 562 (9th Cir. 2016) ............................................................................. 13

*Or. Nat. Res. Council Fund v. Brong,*
    492 F.3d 1120 (9th Cir. 2007) ........................................................................... 29

*Oregon Wild v. BLM,*
    6:14-cv-0110-AA, 2015 WL 1190131 (D. Or. Mar. 14, 2015) ....................... 25, 27

*Pit River Tribe v. U.S. Forest Serv.,*
    469 F.3d 768 (9th Cir. 2006) ............................................................................. 26

*Resources Ltd. v. Robertson,*
    35 F.3d 1300 (9th Cir. 1993) ............................................................................. 26

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ..................................................................................... 5, 12

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,*
    608 F.3d 592 (9th Cir. 2010) ............................................................ 18, 19, 22, 24

*Ursack, Inc. v. Sierra Interagency Black Bear Group,*
    No. 08-cv-1808-SC, 2009 WL 2422784 (N.D. Cal. 2009) ................................ 19

*W. Watersheds Proj. v. BLM,*
    774 F. Supp. 2d 1089 (D. Nev. 2011) ................................................................ 17

*Weyerhaeuser Co. v. FWS,*
    139 S. Ct. 361 (2018) ...................................................................................... 28

*Wilderness Society v. U.S. Forest Serv.,*
    850 F. Supp. 2d 1144 (D. Idaho 2012) .............................................................. 15

**Statutes**

5 U.S.C. § 701 ............................................................................................................. 3

5 U.S.C. § 706 ................................................................................................... 3, 4, 30

28 U.S.C. § 1331 ......................................................................................................... 3

28 U.S.C. § 1391 ......................................................................................................... 3

28 U.S.C. § 2201 ......................................................................................................... 3

28 U.S.C. § 2202 ......................................................................................................... 3

42 U.S.C. § 4321......................................................................................................... 3, 5

42 U.S.C. § 4332......................................................................................................... 5


**Regulations**

40 C.F.R. § 1500......................................................................................................... 3

40 C.F.R. § 1500.1 ..................................................................................................... 3, 6, 15

40 C.F.R. § 1501.4 ..................................................................................................... 6

40 C.F.R. § 1502.15 ................................................................................................... 13

40 C.F.R. § 1502.23 ................................................................................................... 13

40 C.F.R. § 1508.7 ..................................................................................................... 6, 12, 13, 18

40 C.F.R. § 1508.8 ..................................................................................................... 6, 12

40 C.F.R. § 1508.9 ..................................................................................................... 6

40 C.F.R. § 1508.13 ................................................................................................... 6

40 C.F.R. § 1508.27 ................................................................................................... 5, 6, 18, 25

40 C.F.R. § 1508.28 ................................................................................................... 13


**Federal Register**

*NEPA Implementing Regulations Revisions, Phase 2,*
    88 Fed. Reg. 49,924 (July 13, 2023) ................................................................... 5, 6


**Miscellaneous**

Fed. R. Civ. P. 56(A) .................................................................................................. 1, 4

## TABLE OF ACRONYMS

APA...............................................................Administrative Procedure Act

AR........................................................................Administrative Record

BLM ....................................................... U.S. Bureau of Land Management

DNA ................................................Determination of NEPA Adequacy

DR ....................................................................................Decision Record

DN....................................................................................Decision Notice

EA................................................................... Environmental Assessment

EIS.......................................................Environmental Impact Statement

FONSI .................................................Finding of No Significant Impact

ESA ..............................................................Endangered Species Act

FLPMA ...........................Federal Land Planning and Management Act

FWS........................................................... U.S. Fish and Wildlife Service

HLB.............................................................................. Harvest Land Base

LSR....................................................................Late-Successional Reserve

NEPA ............................................... National Environmental Policy Act

NRF..................................................... Nesting, Roosting, and Foraging

RMP .............................................................. Resource Management Plan

RR...............................................................................Riparian Reserve

## MOTION

Plaintiff Cascadia Wildlands respectfully moves for summary judgment, pursuant to FED. R. CIV. P. 56(a), on all claims against defendants U.S. Bureau of Land Management, as set forth in Cascadia's Amended Complaint filed September 7, 2023 (doc. 29). In accordance with Local Rule 7-1, the undersigned certifies that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Cascadia seeks a declaration that the Environmental Assessment and Finding of No Significant Impact for the N126 Project violate the National Environmental Policy Act and implementing regulations. Cascadia seeks a declaration that BLM must prepare an Environmental Impact Statement and that its failure to do so violates the National Environmental Policy Act and its implementing regulations. To remedy these violations of law, Cascadia asks the Court to vacate the Environmental Assessment, Finding of No Significant Impact, and Decision Record for the N126 Project, and order the U.S. Bureau of Land Management to prepare an Environmental Impact Statement.

This Motion is supported by the following Memorandum, and the attached First Declaration of David Barta (doc 37-1).

## MEMORANDUM IN SUPPORT OF MOTION

*1.* **Introduction.**

This case concerns the N126 Project—a 31,470-acre U.S. Bureau of Land Management ("BLM") timber management project in western Oregon—and BLM's insufficient National Environmental Policy Act ("NEPA") analysis on impacts to the imperiled species that inhabit the forests and watersheds within the Project Area: northern spotted owls, marbled murrelet, and coho. Even though the N126 Project occurs within the range of these three species listed under the Endangered Species Act ("ESA"), overlaps temporally and geographically with three other timber projects, and occurs primarily within two protected land use allocations—the Late Successional Reserves ("LSRs") and Riparian Reserves ("RRs")—BLM is authorizing heavy timber operations under a cursory and deficient Environmental Assessment ("EA"). Specifically, BLM arbitrarily concluded that the N126 Project will not have a "significant" impact on the environment without taking the requisite 'hard look' in an Environmental Impact Statement ("EIS"), in contravention of NEPA and circuit precedent. N126 AR 1608–13.

The Administrative Record ("AR") evinces analytical failures at multiple levels. First, BLM arbitrarily and prematurely eliminated 49 different issues, impacts, and resource analyses from detailed consideration. N126 AR 20–21. BLM reasoned that these issues were not related to the Project's purpose and need and were already analyzed in the 2016 Resource Management Plan ("RMP") Final Environmental Impact Statement ("FEIS"), and therefore did not require further NEPA analysis. N126 AR 19–20. But critically, the 2016 RMP FEIS did not—and could not—consider the site-specific impacts of the N126 project years later. BLM's cursory dismissal of these issues violates NEPA, and its attempt to inappropriately "tier" the N126 Project EA to the 2016 FEIS's 2.5-million-acre scale analysis—for issues which its own RMP mandates site-specific analysis—must fail. N126 AR 34680, 35012, 35013, 40999, 41077, 41081.

BLM also failed to analyze the cumulative impacts of three other timber projects that directly overlap with the N126 Project. These other projects were ignored completely, acknowledged in only cursory detail, or mentioned only in BLM's unlawful justification for excluding them from the detailed consideration NEPA requires. Ultimately, BLM's failure to take a 'hard look' at the N126 Project's environmental impacts deprives the public and agency decision-makers of critical information on the project's effects, flouting NEPA's twin "look before you leap" and informed citizenry mandates. *See* 40 C.F.R. § 1500.1(b) (2017).[1] BLM's Finding of No Significant Impact ("FONSI") is therefore arbitrary and capricious. Accordingly, this Court should grant summary judgment in Cascadia's favor, set aside the FONSI, EA, and DR, and order BLM to prepare an EIS that satisfies NEPA's 'hard look' standard.

## II.   Jurisdiction.

This Court has jurisdiction under 28 U.S.C. § 1331 (federal question). The causes of action arise under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* and implementing regulations. The requested relief is proper under 28 U.S.C. §§ 2201 (declaratory relief) & 2202 (injunctive relief), and 5 U.S.C. § 706(2) (vacatur). An actual, justiciable controversy exists between Plaintiff and Defendants.

Venue in this Court is proper under 28 U.S.C. § 1391©(1) because all or a substantial part of the events or omissions giving rise to this litigation occurred within this judicial district. The BLM officials who authorized the decisions at issue in this litigation are headquartered in offices located in

---

[1]    The Council on Environmental Quality ("CEQ") promulgates NEPA regulations, which guide federal agencies in designing their own NEPA procedures. 40 C.F.R. § 1500 *et seq.* (2020). The N126 Project began while the 1978 NEPA regulations were still in effect, and so the 1978 regulations apply to this litigation. *See* N126 AR 325 (citing 40 C.F.R § 1508.27). Consequently, unless otherwise noted, all citations to Title 40, Chapter V of the Code of Federal Regulations refer to the 2017 Edition.

this district. The BLM Siuslaw and Mary's Peak Field Offices, where the N126 Project Decision

Record, the Pucker Up Density Management Project Decision Record, and the Gone Fishin'

Density Management Project Decision Record were all signed, are headquartered in this district. The

NEPA analysis at issue in this litigation was prepared within this district. The BLM-managed lands

and resources at issue in this litigation are located in this district. Additionally, Plaintiff maintains

offices within this district. This case is filed properly in Eugene, Oregon pursuant to Local Rules 3.3

and 3.4 because the N126 Project pertains to public lands in Lane County, Oregon.

### III. Standard of Review.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . .

the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The APA governs

judicial review of agency actions under NEPA. 5 U.S.C. § 706; *Native Ecosystems Council v. Dombeck*,

304 F.3d 886, 891 (9th Cir. 2002). Under the APA, "The reviewing court shall . . . hold unlawful and

set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious "if the agency relied on factors Congress did not

intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an

explanation 'that runs counter to the evidence before the agency or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*,

537 F.3d 981, 987 (9th Cir. 2008) (internal citation omitted). Agency action is valid only if the agency

"considered the relevant factors and articulated a rational connection between the facts found and

the choices made." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). If the agency fails to take

a 'hard look' at the consequences of its action and consider important aspects of the problem in its

EA, its decision is arbitrary and capricious. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d

1208, 1211 (9th Cir. 1998).

Though deferential, the 'arbitrary and capricious' standard does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 97 (1977). BLM is not entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001). "[A]n agency's decision can be upheld only on the basis of the reasoning [found] in that decision." *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). "The reviewing court may not substitute reasons for agency action that are not in the record." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

## IV.  Legal Background.

Congress enacted the National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, to ensure that effects to human health and the environment were considered in all federal agency decisions. NEPA's goals are two-fold: (1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA reflects the "'critical importance of restoring and maintaining environmental quality' to the overall welfare of humankind." *NEPA Implementing Regulations Revisions, Phase 2*, 88 Fed. Reg. 49,924 (July 13, 2023). "Furthermore, NEPA seeks to promote efforts that will prevent or eliminate damage to the environment and biosphere[.]" *Id.*

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Under NEPA, determining the significance of an action's impacts on the environment requires considering the context and intensity of the action, which includes analyzing, *inter alia*, the direct, indirect, and cumulative impacts the action would have on the environment. 40 C.F.R. § 1508.27 (2017). In evaluating intensity, the agency must consider numerous factors, including: impacts that may be both beneficial and adverse;

the unique characteristics of the geographic area such as ecologically critical areas; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may adversely affect an endangered or threatened species or its critical habitat. 40 C.F.R. § 1508.27(b). "The EIS process embodies the understanding that informed decisions are better decisions and lead to better environmental outcomes." 88 Fed. Reg. at 49,924.

To determine whether an action requires an EIS as required by NEPA, an agency may prepare an EA. 40 C.F.R. § 1501.4(b). An EA is a public document that describes the proposal, examines reasonable alternatives, and considers environmental impacts. 40 C.F.R. § 1508.9. If the agency determines an EIS is not required, it must issue a FONSI. *Id.* § 1508.13. The information in an EA, FONSI, and supporting documents must be of high quality and sufficient so the public can question the agency's rationale and understand the agency's decision-making process. *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005); 40 C.F.R. § 1500.1(b).

Direct impacts are caused by the action and occur at the same time and place as the action. *Id.* § 1508.8(a). Indirect impacts are caused by the action and are later in time or farther removed in distance, but still reasonably foreseeable. *Id.* § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id.* Cumulative impacts represent the "incremental impact of the action . . . added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency. *Id.* § 1508.7.

BLM's NEPA procedures are described in its NEPA Handbook. N126 AR 42463–42646. BLM's NEPA procedures authorize decisionmakers to make "determinations of NEPA adequacy" or "DNAs." N126 AR 42495. BLM uses DNAs to confirm that an action is adequately analyzed in

an existing NEPA document and conforms to the approved land use plan. *Id.* Accordingly, DNAs do not require a comment period, and do not contain NEPA analysis. *Id.* BLM has stated that there are four scenarios where the use of DNAs is appropriate: (1) when there is a new proposed action that is similar to a previous action that was already analyzed in a NEPA document, (2) when there is a new proposed action that is a part of a broader action that was already analyzed in a NEPA document, (3) when the original NEPA analysis is old and the agency needs to determine whether new analysis is needed due to new information or changed circumstances, and (4) when there is new information not considered in existing NEPA analysis and the agency needs to determine whether that new information warrants new analysis, regardless of how much time has passed. *Determination of NEPA Adequacy: What is a DNA? When is it Used?*, BLM.[2] BLM uses a "DNA worksheet" to determine whether existing NEPA document(s) can satisfy NEPA's requirements for the proposed action. N126 AR 42496. BLM's NEPA Handbook makes it clear that the DNA worksheet is not a NEPA document. *Id.* It does not contain any new NEPA analysis. *Id.* Rather, it consists of five questions to help determine if a proposed action is covered by prior NEPA analysis. N126 AR 42633–35.

## V. Factual Background.

### A. 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan.

In 2016 BLM signed the Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("2016 RMP"), which provides overall direction for all resources on BLM-administered lands in northwestern Oregon, including the lands at issue in this case. N126 AR 33534–33852. The purposes of the 2016 RMP include contributing to the conservation and recovery

---

[2]    Available at https://www.ntc.blm.gov/krc/uploads/456/BLM-DNA2_What-is-a-DNA_When-is-it-Used.pdf (last accessed Jan. 31, 2024).

of threatened and endangered species, providing clean water in watersheds, restoring fire-adapted ecosystems, and providing a sustained yield of timber. *Id.* at 33544. These purposes are implemented through designated land use allocations with distinct management objectives and direction. *Id.* at 33546–48. Management directions identify what future actions may or may not be allowed within the different land use allocations. *Id.*

Relevant here are the LSRs and RRs. The primary management objectives for LSRs include: (1) maintaining nesting-roosting habitat for the northern spotted owl and nesting habitat for the marbled murrelet; (2) promoting the development of nesting-roosting habitat for the northern spotted owl in stands that do not currently support northern spotted owl nesting and roosting; and (3) promoting the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl. N126 AR 33607. These primary management objectives for the LSRs require BLM to limit its actions to those that do not preclude or delay development of northern spotted owl nesting-roosting habitat by 20 years or more. N126 AR 33609. Additionally, BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for LSRs regardless of northern spotted owl occupancy. N126 AR 33607.

The primary management objectives for RRs include: (1) contributing to the conservation and recovery of ESA-listed fish species and their habitats; (2) maintaining and restoring natural channel dynamics, processes, and the proper functioning condition of riparian areas; and (3) maintaining water quality and streamflows to protect aquatic biodiversity and to provide quality water for recreation and drinking water sources. N126 AR 33611. BLM is required to follow its management direction within the 2016 RMP and allowable use restrictions for RRs, including using site-specific Best Management Practices to maintain water quality during land management actions. N126 AR 33612.

**B.  N126 LSR Landscape Plan Project.**

On May 15, 2020, the Northwest Oregon District Siuslaw Field Office of BLM published for public comment the N126 LSR Landscape Plan Project Environmental Assessment ("N126 EA"). N126 AR 13121–13282. On August 10, 2020, BLM issued its Decision Record for the N126 Project, and on August 11, 2020, BLM issued its FONSI for the N126 Project. N126 AR 1845–1910, 1608–13. The FONSI found that implementation of the proposed action would not have significant environmental impacts beyond those already addressed in the Proposed Resource Management Plan and FEIS for Western Oregon, and that it was consistent with the 2016 RMP. N126 AR 1608. Further, BLM found that the proposed action did not constitute a major federal action having a significant effect on the human environment, and therefore an EIS was not necessary. *Id.* On February 19, 2021, BLM released the final EA for the project. N126 AR 7–224. Cascadia submitted timely comments on the N126 EA. N126 AR 21818–29, 21839–70. The final EA selects alternative 5 as the proposed action, which includes commercial timber harvest and non-commercial restoration treatments in the 30–130-year age class of trees. N126 AR 23. Further, under this alternative, some commercial thinning would also occur in recently active northern spotted owl sites with limited habitat. *Id.*

The area surrounding the N126 Project is heavily "checkerboarded," with parcels of public land alternating with privately held parcels. N126 AR 155 (project area map). The Project proposes actions intended to restore complex late-successional forests, including commercial timber harvest and non-commercial restoration treatment and associated connected actions (including roadwork and fuels treatments). N126 AR 12. The Project specifically authorizes treatment of 16,230 acres across a 31,470-acre project area, including 14,227 acres within LSR and 2,003 acres in Riparian Reserves, with a total estimated harvest volume of 380mmbf (million board feet) of timber. N126

AR 26. Additionally, 50 to 90 miles of new roads will be constructed, and 300 to 420 miles of existing roads will be renovated. N126 AR 27.

Of the 14,227 acres of LSR that will be treated, 13,353 acres will be harvested commercially, and 13,250 of those acres will have canopy cover reduced to between 40 and 60 percent. N126 AR 26. All 2,003 acres of RRs will be harvested commercially. *Id.* Of these commercially harvested stands, 1,835 acres will have canopy cover reduced to between 45 and 60 percent. *Id.*

The N126 Project is located within the geographic range of the northern spotted owl, marbled murrelet, and Oregon Coast coho salmon, all of which are classified as threatened under the ESA. N126 AR 13. The northern spotted owl and marbled murrelet are associated with complex late-successional habitat, which is present in the Project area. *Id.* The N126 Project area encompasses portions of seven watersheds, including the Lake Creek watershed within which most of the Project exists. N126 AR 12.

1.    *The Pucker Up Density Management Project DNA.*

On April 15, 2021, BLM issued the draft Pucker Up Density Management Project DNA, the first draft DNA released pursuant to the N126 EA/FONSI, for public comment. Administrative Record for Pucker Up Density Management Project ("PU AR") 215–35. On May 25, 2021, Cascadia filed timely comments on the draft Pucker Up DNA raising concerns with BLM's use of a DNA to implement this portion of the N126 Project. PU AR 160–76. On July 8, 2021, BLM issued a final DNA and Decision Record for the Pucker Up Density Management Project ("Pucker Up DNA"). PU AR 6–43.

In the Pucker Up DNA, BLM concluded that (1) the proposal conforms to the applicable land use plan (2016 RMP) and (2) the analysis contained in the N126 EA fully covers the proposed action and satisfies BLM's requirements under NEPA. PU AR 41. The Pucker Up DNA does not contain any NEPA analysis, site-specific or otherwise.

Appendix A to the Pucker Up DNA describes the harvest prescription for BLM's proposed action: 415 acres of commercial and non-commercial thinning in reserve allocations in the Lake Creek watershed: 319 acres of commercial thinning in the LSR, 9 acres of commercial thinning in the outer Riparian Reserves, and 64 acres of non-commercial thinning in the LSR. PU AR 221. BLM also plans to construct almost one mile of new road and renovate about 4.5 miles of existing roads. PU AR 6.

2. *The Gone Fishin' Density Management Project DNA.*

On October 19, 2021, BLM issued the draft Gone Fishin' Density Management Project DNA, the second draft DNA released pursuant to the N126 EA/FONSI, for public comment. Administrative Record for Gone Fishin' Density Management Project ("GF AR") 363–83. On November 17, 2021, Cascadia filed timely comments on the draft Gone Fishin' DNA and raised additional concerns with BLM's use of another DNA to implement a portion of the N126 Project. GF AR 232–38, 239–52.

On February 2, 2022, BLM issued a final DNA and Decision Record for the Gone Fishin' Project ("Gone Fishin' DNA"). GF AR 1–34. In the Gone Fishin' DNA, BLM concluded that (1) the proposal conforms to the applicable land use plan (2016 RMP) and (2) the analysis contained in the N126 EA fully covers the proposed action and satisfies BLM's requirements under NEPA. GF AR 1. The Gone Fishin' DNA also does not contain any NEPA analysis, site-specific or otherwise.

Appendix A to the Gone Fishin' DNA describes the harvest prescription for BLM's proposed action: 276 acres of commercial harvest in the LSR and Riparian Reserves and 29 acres of non-commercial thinning in the LSR within the Lake Creek watershed. GF AR 11. BLM also plans to construct half a mile of new road and renovate about 7 miles of existing roads. GF AR 16. BLM continues to issue DNAs pursuant to the N126 EA.

**VI. Argument.**

BLM has set the terms for 10 years of commercial timber harvest in a 31,000-acre project area, over half of which will occur within land use allocations that are designated for protecting and facilitating the development of late-successional habitat—not for timber harvest. BLM determined that doing so would not have a significant effect on the environment and would comply with the RMP. But despite authorizing extensive commercial thinning in the Late-Successional and Riparian Reserves, BLM declined to analyze the issues most relevant to those land use designations, *i.e.*, direct, indirect, and cumulative effects on imperiled wildlife and their habitat. This analytical failure violates the "hard look" requirement under NEPA, and renders the FONSI arbitrary and capricious.

**A. BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the N126 Project and failed to conduct the required site-specific analysis in violation of NEPA.**

NEPA requires that agencies take a 'hard look' at the environmental consequences of a proposed action and broadly disseminate relevant environmental information to the public. *Robertson*, 490 U.S. at 350.[3] NEPA requires that an EA analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects which . . . are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. An EA must also assess the cumulative effects of agency action—those effects resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* §§ 1508.7–8. CEQ's Guidance states that programmatic NEPA reviews should have a "particular emphasis on cumulative impacts." Such effects can result from individually minor but collectively significant actions taking place over time. *Id.* § 1508.7.

---

3    N126 AR 37383 (Council on Environmental Quality, *Effective Use of Programmatic NEPA Reviews* (Dec. 18, 2014)) ("A programmatic NEPA review should contain sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at the environmental effects and make a reasoned choice among alternatives").

NEPA also requires that agencies "describe the environment of the area(s) to be affected or created by the alternatives under consideration," setting forth the baseline conditions of an area before project implementation occurs. *Id.* § 1502.15; *see also id.* § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."); *id.* § 1502.23 (obligating the agency to ensure "the professional integrity, including scientific integrity of the discussions and analyses"). Without information regarding the site-specific baseline conditions of the project area, the agency cannot accurately determine the environmental effects of a proposed project and therefore cannot comply with NEPA. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016) ("Establishing appropriate baseline conditions is critical to any NEPA analysis"); *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016) (holding that an agency's assessment of baseline conditions "must be based on accurate information and defensible reasoning").

BLM asserts that the N126 "programmatic EA" tiers to the 2016 RMP/FEIS, which is itself a programmatic EIS. N126 AR 18. NEPA permits tiering where there is a broad programmatic EIS, like the 2016 RMP/FEIS, and a subsequent evaluation that incorporates by reference the general discussions of the broader document *and* includes site-specific analysis. 40 C.F.R. § 1508.28. The problem here is that neither the 2016 RMP/FEIS nor the N126 EA contain site-specific analysis. Instead, the N126 EA is merely a second programmatic NEPA document that largely relies on the same coarse data the BLM relied upon in developing the 2016 RMP/FEIS. Rather than document or incorporate site-specific data, the N126 EA relies on assumptions and defers required analysis for "verification" (which is not effects analysis) at the implementation stage. N126 AR 18 ("Site-specific

project implementation would verify that treatment effects fall within the range of effects described in this EA.").[4]

This tiering approach has already been rejected by the court. *See Cascadia Wildlands v. BLM ("Thurston I")*, 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019). In that case, the Court rejected BLM's attempt to tier a timber sale EA to the 2016 RMP FEIS, because it "did not analyze site-specific geographic conditions or effects on the immediate area, nor did the [EA]." *Id.* at 1158. The Court reasoned that the BLM improperly diluted the proposed action's effects by utilizing the RMP's million-acre-plus scale of effects analysis, *id.* at 1157; and held that an "agency cannot minimize an activity's environmental impact by adopting a broad scale analysis and marginalizing the activity's site-specific impact." *Id.*

The N126 EA lists forty-nine "issues considered but not presented for detailed analysis in the [N126 EA]" related to resources that have the potential to be affected by the N126 Project. N126 AR 20-21. The EA states that BLM "conducted a substantial analysis" for some of those issues but concluded that "no detailed presentation of [those] issues was warranted in this EA." N126 AR 20. BLM justified its decision not to present any of the forty-nine issues "in detail" with the conclusory statement that there was no environmental effect "beyond the level described by the Proposed RMP/Final EIS, and they did not relate to how the proposed action or alternatives

---

[4]   In lieu of site-specific analysis in the EA, BLM uses DNAs, which the agency itself recognizes in its NEPA Handbook are not NEPA documents, N126 AR 42496, and do not contain new analysis, N126 AR 42494 (explaining that DNAs are properly used when existing environmental analysis may be relied on in its entirety and new NEPA analysis is not necessary),[4] to implement individual timber sales. N126 AR 18 ("Site-specific project implementation would verify that treatment effects fall within the range of effects described in this EA for the selected alternative, and would be consistent with the selected management approach."). BLM is essentially playing a shell game with a programmatic EIS, a programmatic EA, and DNAs. From afar it may look like NEPA, but at no point does BLM perform the site-specific analysis of the N126 Project's environmental consequences that NEPA requires.

respond to the purpose and need." N126 AR 20. However, this is simply not the analysis required by NEPA—BLM must determine the significance of *this* action.

Among those issues not analyzed in detail in the N126 EA include the N126 Project's effects on the recovery and survival of the northern spotted owl, effects on slope stability and risk of mass failure, effects on soil health, and effects to native fish populations and Oregon Coast coho salmon in the project area. N126 AR 20–21.

> 1. *BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the N126 Project on northern spotted owl recovery.*

The N126 EA failed to consider the direct, indirect, and cumulative effects of the N126 Project on the recovery and survival of the northern spotted owl, instead dismissing the question of how the alternatives would "contribute to the recovery and survival of the northern spotted owl?" in the "Issues considered but not presented for detailed analysis in the [N126 EA]" section. N126 AR 20. BLM merely offers the conclusory statement that "[a]ll action alternatives analyzed in detail support the recovery of the northern spotted owl in the local area because they restore suitable habitat for this species while avoiding harm to individuals during implementation." N126 AR 111. This is legally deficient, conclusory, and factually irreconcilable with the record. It cannot be squared with the fact BLM found, and the U.S. Fish & Wildlife Service ("FWS") concurred, the N126 Project **may affect and is likely to adversely affect northern spotted owls**, N126 AR 76, through commercial thinning that removes habitat in "recently active northern spotted owl sites." *Id.* 86. BLM's assumption that the N126 Project will eventually support spotted owl recovery does not satisfy NEPA. *See Wilderness Soc. v. U.S. Forest Serv.,* 850 F. Supp. 2d 1144, 1161 (D. Idaho 2012) (an EA that relies heavily on assumed beneficial effects does not meet the 'hard look' standard); *accord Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1223–24 (9th Cir. 2008).

BLM's justification for not analyzing the effects of the N126 Project on the recovery and survival of the northern spotted owl is that "BLM's contribution to the recovery of the northern

spotted owl was addressed in the [2016 RMP/FEIS]" and analysis of effects on the recovery and

survival of the northern spotted owl "was not needed to inform the decision and is not associated

with environmental effects beyond those analyzed in the EA or in the [2016 RMP/FEIS]." N126

AR 110–11. The 2016 RMP/FEIS, itself a broad programmatic document, also lacks sufficient site-

specific analysis of recovery effects. These conclusory and general statements do not fulfill the hard

look required by NEPA. *See Klamath-Siskiyou Wildlands Ctr. v. BLM,* 387 F.3d 989, 995, 997 (9th Cir.

2004) (holding that a conclusory presentation that does not offer any more than general statements

about possible effects and some risk is insufficient to constitute a hard look and that tiering to a

programmatic RMP-EIS with general statements cannot save an EA with insufficient analysis).

    2.   *BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the N126 Project on sedimentation and failure to conduct site-specific analysis.*

       The N126 EA failed to consider the impacts of sedimentation on aquatic resources,

including impacts to fish listed under the ESA and landslide risk, and dismissed the issue in the

"Issues considered but not presented for detailed analysis in the [N126 EA]" section. N126 AR 20.

NEPA requires BLM to take a hard look at the environmental effects of the N126 Project on

sedimentation and to conduct site-specific analysis. *See Blue Mtns. Biodiversity Project*, 161 F.3d at

1213–14 ("The EA's cursory and inconsistent treatment of sedimentation issues, alone, raises

substantial questions about the project's effects on the environment and the unknown risks to the

area's renowned fish populations").

       The N126 EA acknowledges the project area's "history of landslides," noting that "[t]he soils

and bedrock in this area" have been linked to "higher landslide susceptibility." N126 AR 104. These

geological risk factors are compounded by "steep slopes and periods of heavy rain", all of which

together "contribute to landslide risk." *Id.* While the N126 EA attempts to justify its lack of analysis

related to this issue by pointing to the 2016 RMP/FEIS, N126 AR 105, it also admits:

The [N126 Project] occurs on LSR landscapes proposed for thinning treatments, which were not analyzed for landslide frequency or slope instability in detail in the [2016 RMP/FEIS] due to the assumed negligible increases in landslide risk. While landslide prone landscapes comprised a small portion of the [2016 RMP/FEIS] analysis area, they comprise a large portion of the landscape within the N126 treatment area. Despite these differences, the N126 project is expected to be within the range of effects analyzed in the [2016 RMP/FEIS] because of project design features for both timber harvest and road construction.

N126 AR 105. In sum, the N126 EA admits that neither that document nor the 2016 RMP/FEIS assessed site-specific landslide risk. This violates NEPA. *Thurston I*, 410 F. Supp. 3d at 1157; *see also W. Watersheds Project v. BLM*, 774 F. Supp. 2d 1089, 1099 (D. Nev. 2011) ("Only where neither the general nor the site-specific documents address significant issues is the environmental review rejected.").

Instead of taking a 'hard look' in the EA at the impacts of the project on soils, and in particular landslide risk, BLM arbitrarily concluded that the effects to sedimentation would remain within the range of effects described in the 2016 RMP/FEIS—despite BLM's acknowledgment that landslide frequency or slope instability of the N126 project were not analyzed in detail in the 2016 RMP/FEIS. Without further discussion or analysis, and citing only its own NEPA Handbook in support, *see* N126 AR 42513, BLM concluded that the issue of slope instability and risk of mass failure "*does not inform the decision and is not associated with environmental effects*." N126 AR 104 (emphasis added). This astonishing conclusion defies science, law, and common sense in equal measure. *See Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d 1033, 1041 (N.D. Cal. 2015) (recognizing the harmful effects on coho from sedimentation caused by slope failure associated with logging roads).

BLM's reliance on "project design features," N126 AR 105, which the agency "expects" will allow the Project to remain within the range of effects analyzed in the 2016 RMP/EIS, *id.*, does not remedy its NEPA violation. *See Klamath-Siskiyou Wildlands Ctr*, 387 F.3d at 995 (conclusory and general statements in an EA about project design features reducing or eliminating impacts are

insufficient to constitute a 'hard look'; *accord Ocean Advocates v. Army Corps of Eng'rs*, 361 F.3d 1108,

1128 (9th Cir. 2004). BLM's failure to take a hard look at the environmental effects of the N126

Project on sedimentation and to conduct site-specific analysis related to this issue violates NEPA.

> 3. *BLM failed to consider the cumulative impacts of the N126 Project with other past, present, and reasonably foreseeable actions.*

The N126 EA also failed to take the requisite 'hard look' at the cumulative impacts of "other

past, present, and reasonably foreseeable actions" that are planned and spatially or temporally

overlap with the N126 Project. 40 C.F.R. § 1508.7; *see also Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at

993. Specifically, BLM failed to account for the cumulative impacts of the Forest Service's

Deadwood Creek Restoration Project, the Northwest Oregon District Aquatic and Riparian Habitat

Restoration Project, and the Siuslaw HLB Landscape Plan Project, all of which overlap in time and

space with the N126 Project.

In determining whether a project will have a "significant" environmental effect, agencies

must also consider whether an action may have any cumulative significant impacts. 40 C.F.R. §

1508.27(b)(7). The purpose of analyzing cumulative effects is to avoid "the tyranny of small

decisions." *Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002). Cumulative impacts can "result from

individual minor but collectively significant actions taking place over a period of time." 40 C.F.R. §

1508.7. Accordingly, a cumulative impacts analysis must evaluate "the incremental impact of the

actions when added to other past, present, and reasonably foreseeable future actions" undertaken by

any person or agency. *Id.* To prevail on a cumulative effects claim, plaintiffs "need not show what

impacts would occur" as "to hold otherwise would require the public, rather than the agency, to

ascertain the cumulative effects of a proposed action." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S.

Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010). Rather, plaintiffs "must show only the potential for

a cumulative impact." *Id.*

The N126 EA failed to consider the cumulative impacts of three projects that overl©p in time and space with the N126 Project: BLM's Siuslaw HLB Landscape Plan Project and the Forest Service's Deadwood Creek Restoration Project and Northwest Oregon District Aquatic and Riparian Habitat Restoration Project. While the N126 EA does acknowledge the existence of two of these projects, this mere acknowledgment cannot satisfy NEPA's requisite 'hard look' and falls far short of an adequate cumulative impacts analysis under NEPA. *Te-Moak*, 608 F.3d at 603 (the cumulative impacts analysis "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment[.] Without such information, neither the court nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide.").

The most glaring deficiency of BLM's cumulative impacts analysis in the N126 EA is that it neglects to even acknowledge the existence of the Siuslaw HLB Landscape Plan Project, which overlaps with the N126 Project both temporally[5] and geographically. *Compare* Siuslaw HLB Project Area Map[6], *with* N126 Project Area Map, N126 AR 155. The lack of any acknowledgment of the

---

[5]   Development of the Siuslaw HLB Project was well underway while the N126 Project was being developed: The scoping letter for the Siuslaw HLB Project was released on November 18, 2019, https://eplanning.blm.gov/eplanning-ui/project/1502250/570, and the draft N126 EA was released for public comment on May 15, 2020, https://eplanning.blm.gov/eplanning-ui/project/117556/570.

[6]   Available on BLM's ePlanning portal: https://eplanning.blm.gov/public_projects/nepa/1502250/20008057/250009509/2019_10_01_HLB-Landscapeplan_Area_Map_11X17.pdf (last accessed Feb. 7, 2024). As an agency record the authenticity of which is not in serious dispute, the Court may take judicial notice of this and other publicly available BLM documents associated with the Siuslaw HLB Project. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986); *Ursack, Inc. v. Sierra Interagency Black Bear Group*, No. 08-cv-1808-SC, 2009 WL 2422784, *6 (N.D. Cal. 2009) (judicial notice of agency materials posted on agency website). The record review limitation does not compel otherwise, because Cascadia argues BLM failed to consider cumulative effects of the Siuslaw HLB Project as a relevant factor to its decision. *See Lands Council I*, 395 F.3d at 1030 (9th Cir. 2005) ("district courts are

Siuslaw HLB Project in the N126 EA cumulative impacts analysis is inexplicable, as the Siuslaw

HLB Landscape Plan involves significant timber harvest on 13,225 acres of BLM-administered

forestland, Siuslaw HLB Landscape Plan EA 2, "has <90 percent of its haul route within the N126

LSR analysis area," *id.* at 93, and the total acreage to be harvested from both projects will total

around 45,000 acres.

      Many of the units slated for logging under the Siuslaw Project are interspersed with areas of

forest which BLM intends to commercially log pursuant to the N126 Project. Siuslaw HLB

Landscape Plan EA, 2. For example, these two projects are within the same watershed and

authorized by the same District. Approximately 25,200 acres of LSR and RR LUA stands in the

N126 Project are located within the Siuslaw Field Office, N126 AR 12, and both projects encompass

portions of the same Hydrologic Unit Code (HUC) 10 Watersheds, including Lake Creek, Long

Tom River, and Wild Cat Creek. *See* N126 EA 12, Siuslaw HLB Landscape Plan EA 2.

      The overlapping projects will have significant cumulative effects on fish and wildlife, erosion

and water quality, invasive species infestations, fire hazard, forest age and structural class, and

wildlife habitat. *See* N126 AR 18–19 (issues pertaining to "environmental effects" overlap Siuslaw

Project issues). However, in the N126 EA, BLM eliminated most of these issues from detailed

consideration. *See* N126 AR 90–91 (noxious weeds, also admitting potentially significant effects);

N126 AR 92 (impacts to carbon storage and greenhouse gas emissions); N126 AR 107 (soils); N126

AR 118 (Bureau Sensitive Species); and N126 AR 11–17 (impacts to spotted owls and marbled

murrelets).

      There is no acknowledgement, let alone the necessary "quantified or detailed information,"

of the Siuslaw HLB Landscape Plan Project and the overall combined effects from both projects. *See*

---

permitted to admit extra-record evidence . . . if admission is necessary to determine 'whether the
agency has considered all relevant factors and has explained its decision[.]'").

*Ocean Advocates*, 361 F.3d at 1128 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d

1372, 1379–80 (9th Cir. 1998)) ("A cumulative impacts analysis that satisfies NEPA requires 'some

quantified or detailed information; . . . general statements about 'possible effects' and 'some risk' do

not constitute a 'hard look' absent a justification regarding why more definitive information could

not be provided.'"). BLM's silence in the N126 EA as to the Siuslaw HLB Landscape Plan Project

signifies a failure to conduct the requisite 'hard look' under NEPA.

As noted, the N126 EA does acknowledge the Deadwood Creek Restoration Project, a

Forest Service aquatic and terrestrial restoration project, "within the spatial and temporal scale of

[the N126] analysis," N126 AR 67. However, the N126 EA only acknowledges the Deadwood Creek

Restoration Project in its cumulative effects analysis on road-related sediment delivery within 200-

feet of streams. N126 AR 67–68. There is no other mention of this project in any other cumulative

effects analysis within the N126 EA. *See* N126 AR 58. This brief discussion of sedimentation effects

from the Deadwood Creek Restoration Project, while apparent within the N126 EA, does not cure

the fact that this is the only discussion of the cumulative effects from this project. *See Klamath-*

*Siskiyou Wildlands Center*, 387 F.3d at 993–97 (holding that cumulative effects analysis was deficient

when the potential for serious cumulative impacts is apparent but the EA primarily consisted of

generalized conclusory statements that effects are not significant or will be effectively mitigated).

The N126 EA does not analyze the cumulative effects of this project on ESA-listed species.

*See* N126 AR 58. With regards to the northern spotted owl and marbled murrelet, the N126 EA

states that BLM "conducted cumulative effects analysis based on past, present, and reasonably

foreseeable future actions within the project area" 21ncorporateorat[ing] past actions in the

discussion of the effected environment" and "discuss[ing] present actions proposed . . . in the direct

and indirect effects section for each alternative." N126 AR 58. Yet there is no mention of the

Deadwood Creek Restoration Project in the N126 EA's discussion of the effected environment or

direct and indirect effects section for each alternative, *see* N126 AR 53–54, meaning that no cumulative effects analysis was actually done on the impacts from the Deadwood Creek Restoration Project on ESA-listed species. In sum, while BLM did acknowledge the sedimentation effects of the Deadwood Creek Restoration Project on the N126 Project, it failed to "give a sufficiently detailed catalogue" of the effects of the Deadwood Creek Project on ESA-listed species in its cumulative effects analysis on this issue. *See Te-Moak*, 608 F.3d at 603.

The N126 EA also acknowledges the existence of the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project, *see* N126 AR 63, 96, 98, 165, but again fails to conduct any analysis of the impact that this project would have in relation to the N126 Project. *See* N126 AR 58, 67. This is problematic because the Aquatic and Riparian Habitat Restoration Project covers the N126 Project Area, involves "a variety of aquatic and riparian habitat restoration projects on BLM-administered lands and non-BLM administered lands within the District," and "includes forest management actions." *See* N126 AR 16014. Even more concerning, in the N126 EA, BLM merely mentions the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project three times, none of which are in the context of a cumulative effects analysis. *See* N126 AR 63, 96, 98.

For example, in its discussion on the environmental consequences of road-related sediment delivery within 20-feet of streams, the N126 EA "assumes that the effects of fine sediment delivery from the replacement and installation of stream crossing culverts has no measurable direct or indirect effect on fine sediment delivery from the action alternatives," based "on the analysis in the Northwest Oregon District Aquatic and Riparian Habitat Restoration EA." N126 AR 63. The N126 also states that "fish passage was not a purpose or need for this project" because "BLM would use the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project EA to actively seek out and replace barriers to fish passage." N126 AR 96. Although "it [was] unknown at this scale of analysis the amount of fish passage culverts each alternative would replace during project

implementation," the N126 EA says that the "effects of this action are fully disclosed in the

Northwest Oregon District Aquatic and Riparian Habitat Restoration EA." N126 AR 96. Finally,

the N126 EA states that "BLM considered watershed restoration efforts in the N126 LSR

Landscape Plan project but did not present it as an issue" because BLM has "analyzed aquatic

restoration actions in the Northwest Oregon District Aquatics and Riparian Habitat EA." N126 AR

98. In other words, the only times the N126 EA acknowledges the Northwest Oregon District

Aquatics and Riparian Habitat Project is in relation to issues that were dismissed from detailed

consideration. *See* N126 AR 63, 96, 98.

Regarding the N126 EA's actual cumulative effects analysis, the discussion of road-related

sediment delivery within 200-feet of streams makes no mention of the Aquatic and Riparian Habitat

Restoration Project. *See* N126 AR 67. Moreover, the cumulative effects section for ESA-listed

species in the N126 EA also makes no mention of this project, even though it states that "[t]he BLM

conducted cumulative effects analysis based on past, present, and reasonably foreseeable future

actions within the project area," "incorporated past actions in the discussion of the affected

environment," and "discussed present actions in the direct and indirect effects section for each

alternative." N126 AR 58. The complete disregard for the Aquatic and Riparian Habitat Restoration

Project within the cumulative effects analysis for ESA-listed species and sedimentation within the

N126 EA does not constitute the requisite hard look under NEPA.

In sum, while the Aquatic and Riparian Habitat Restoration Project is acknowledged in the

N126 EA, this discussion only serves to highlight the need for a full and fair cumulative impacts

analysis. It is evident that the N126 EA does not evaluate "the incremental impact" of the N126

Project when "added to other . . . present" actions—the Northwest Oregon District Aquatics and

Riparian Habitat Project—and only "gives general statements about possible effects and some

risk[s]" with no "justification as to why more information could not be provided." *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993.

While the N126 EA gives a cursory and incomplete attempt at a cumulative effects analysis of the Deadwood Creek Project, it fails to even attempt to provide a cumulative effects analysis for the Siuslaw HLB Project and the Aquatic and Riparian Habitat Restoration Project. The consideration of cumulative effects is so important because if the total impact from such small, incremental actions are not aggregated, it would be easy to "underestimate the cumulative impacts[.]" *Kern*, 284 F.3d at 1978. As the Ninth Circuit has observed,

> Sometimes the total impact from a set of actions may be greater than the sum of the parts. For example, the addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that no salmon survive.

*Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994. BLM's failure to take a hard look at the cumulative effects of the N126 Project with the Deadwood Creek Project, the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project, and the Siuslaw HLB Landscape Plan Project violates NEPA.

**B.  BLM unlawfully failed to prepare an EIS.**

NEPA requires federal agencies to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C), *Blue Mtns. Biodiversity Project*, 161 F.3d at 1212. In a challenge to a FONSI, a "plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project *may* have a significant effect, an EIS must be prepared." *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 56[2] (9th Cir. 2006) (citing *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 114[9] (9th Cir. 1998)) (emphasis in original). This "is a low standard." *Id.* Many of the same issues that BLM's analysis failed to take the requisite 'hard look' at, *supra*, moreover necessitate preparation of an EIS.

When determining whether a proposed action may "significantly" impact the environment, an agency must consider both the context and intensity of the action. 40 C.F.R. § 1508.27. The context of the action includes "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of impact." *Id.* § 1508.27(b). NEPA regulations list ten non-exhaustive factors that inform an agency's intensity determination. *Id.* § 1508.27(b). The presence of any single significance factor can trigger the requirement to prepare an EIS. *See Ctr. for Biological Diversity*, 538 F.3d at 1220 ("an action may be 'significant' if one of these factors is met"). The EIS requirement may also be triggered when several significance factors, even if insignificant "considered individually," are collectively significant. *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1283 (D. Or. 2013). Here, the record shows that the N126 Project is likely to have significant environmental impacts due to several intensity factors, which necessitate preparation of an EIS both individually and collectively. *See id.* at 1283–84.

> 1.  *The N126 Project will impact ESA-listed species and designated critical habitat.*

This project will impact ESA-listed species, including the northern spotted owl, marbled murrelet, Oregon Coast Coho, and their habitat. 40 C.F.R. § 1508.27(b)(9). This factor hinges on the degree to which the action would adversely affect ESA-listed species or their designated critical habitat, based on analysis in the EA. N126 AR 42545. Despite conservation efforts under the Northwest Forest Plan and LSRs, spotted owl populations continue to decline on a range-wide basis due, in part, to the continued logging of the species' habitat. *See Oregon Wild v. BLM*, 6:14-CV-0110-AA, 2015 WL 1190131, at *1 (D. Or. Mar. 14, 2015). Nevertheless, BLM concluded the N126 Project supports spotted owl recovery. N126 AR 110–11.

Yet according to the EA, one of the issues ***not*** considered in detail was "how would the alternatives contribute to the recovery and survival of the northern spotted owl?" N126 AR 21, 110–

11. This despite the fact the first stated need for the N126 Project in the EA is to restore late-successional habitat in the LSR, and the first stated purpose is to speed that process. N126 AR 16–17. Instead, BLM states its "contribution to the recovery of the northern spotted owl was addressed in the RMP Final EIS, and that discussion is incorporated [in the EA] by reference." N126 AR 111.

As noted, the N126 EA's deficient analysis cannot be saved by an attempt to tier it to the RMP EIS. As a landscape-scale programmatic document, the RMP EIS lacks sufficient site-specific analysis of recovery impacts. *'Ilio'ulaokalani Coal. v. Rumsfeld,* 464 F.3d 1083, 1095–9[6] (9th Cir. 2006); *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 78[4] (9th Cir. 2006); *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1993). Indeed, "nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific [EA]." *Blue Mountains Biodiversity Project*, 161 F.3d at 1214.

Further, the FWS Biological Opinion (covering all of BLM's Northwest Oregon District's Habitat Alteration Projects in Fiscal Year 2018–19) states that the N126 Project will remove high-quality northern spotted owl habitat at a number of known owl sites, while the N126 EA confirms thinning will occur in 17 recently active northern spotted owl sites. N126 AR 53. Yet the EA contains no analysis of the adverse effects of those actions (or the rest of the project) on spotted owls. *See* N126 AR 111.

As for marbled murrelet, the 2016 RMP requires BLM to assess a project area for marbled murrelet structure, which is to include a buffer of 726 feet, before marbled murrelet nesting habitat is modified. N126 AR 33641. Although the project area contains stands known to be occupied by marbled murrelets, the N126 EA punts the analysis. There is no analysis using existing maps and surveys of occupied murrelet nesting stands and stand exams that can in turn inform appropriate habitat buffers. Having forgone any meaningful analysis of these factors, the N126 EA concludes that the only expected adverse effects to the habitats of the northern spotted owl and the marbled

murrelet are the adverse effects from road construction. N126 AR 54–55. But a court "cannot defer to a void." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d at 1121.

The N126 EA also states that Oregon Coast coho salmon are present in six of the seven watersheds in the project area. N126 AR 1622. Despite the planned treatment of 2,003 acres of harvest in Riparian Reserves and 50 to 90 miles of new road construction, the N126 EA does not contain any analysis of effects to Oregon Coast coho salmon in the N126 Project area. *See* N126 AR 20, 97, 205, 217. Instead, BLM again seeks to tier to the 2016 RMP for its analysis of effects to Oregon Coast coho salmon. This is not permissible; as noted, nothing in the 2016 RMP or its EIS can fill in for the absent site-specific analysis that should have gone into an EIS for the N126 project.

Sedimentation is a significant limiting factor on coho productivity. N126 AR 10289, 10349. The N126 Project area includes steep slopes with pitches up to 65% where sedimentation is of particularly high concern. *See* GF AR 830. Consistent with the significant degree of commercial thinning in the Riparian Reserves (over 2000 acres), implementation of the N126 Project is anticipated to nearly double sediment delivery from a baseline 123.5 tons/year to 240.4 tons/year. N126 AR 66. While the N126 EA fails to analyze the impact of such a dramatic increase in sedimentation on coho populations, what it does disclose about the increased rate of sedimentation underscores the need for an EIS. It is not possible to manage habitat for threatened species at the landscape level without conducting any actual analysis of wildlife habitat at the landscape level or site-specific level. *See Thurston I*, 410 F. Supp. 3d at 1153–54.

FWS concurred that the N126 Project "may affect" and "is likely to adversely affect" the northern spotted owl and marbled murrelet, due to the habitat removal it entails. N126 AR 1612–13. Courts including this one have found the loss of spotted owl critical habitat to significant under NEPA. For example, in *Oregon Wild v. BLM*, the district court held that an EIS was required because

the project at issue there involved logging 187 acres of northern spotted owl critical habitat, resulting in the loss of 153 acres of suitable habitat. 2015 WL 1190131, at *9–10. Here, individual timber sales planned under the N126 Project so far fall entirely within critical habitat. *See* GF AR 4, 268, 384 (entire 434-acre 'Gone Fishin' Project is in spotted owl and marbled murrelet critical habitat); PU AR 6, 21–22 (entire 415-acre 'Pucker Up' Project is in spotted owl and marbled murrelet critical habitat).

The analytical deficiencies explained above, taken together with disclosed adverse effects to critical habitat, raise substantial questions whether the N126 Project may have a significant effect on the environment. These factors consequently contribute to the intensity of impacts requiring an EIS.

2. *The N126 Project area contains unique characteristics.*

The Project will negatively affect the unique characteristics of this area, including ecologically critical areas for listed species and Late Successional Reserves and Riparian Reserves, by permitting logging of 13,353 acres of LSRs and 2,003 acres of Riparian Reserves. N126 AR 26. The N126 Project area contains several unique characteristics present in the Project area. First, NEPA regulations specifically list "ecologically critical areas" as a unique characteristic. *Env't. Prot. Info. Ctr. v. Blackwell*, No. 04-cv-1027-WBS-GGH, 2005 WL 8176926, *5 (E.D. Cal. May 5, 2005) (critical habitat is an "ecologically critical area"); *see also Cascadia Wildlands*, 937 F. Supp. 2d at 1283 (Riparian Reserves are "ecologically critical"). The Project area contains designated critical habitat for the ESA-listed northern spotted owl, marbled murrelet, and Oregon Coast coho salmon. N126 AR 13019, 13052; GF AR 268, 348; PU AR 192, 229–30. Under the statutory definition, critical habitat is an area occupied by the species "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," as well as unoccupied areas that the Secretary determines to be "essential for the conservation of the species." *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361, 368–69

(2018) (citing 16 U.S.C. § 1532(5)(A)). This definition "identifies only certain areas that are indispensable to the conservation of the endangered species." *Id.* at 369. Critical habitat areas are thus ecologically critical areas by definition: they are critical for the conservation of a species. Therefore, the areas of this Project which encompass critical habitat for northern spotted owl, marbled murrelet, and Oregon Coast coho, are areas with unique characteristics.

The Project will remove northern spotted owl habitat at known owl sites and will thin in 17 recently active northern spotted owl sites. N126 AR 53. Additionally, proposed commercial logging will remove late successional stands with multi-story canopies and decadent components, which represent core features of northern spotted owl nesting, roosting, and foraging ("NRF") habitat. N126 AR 38571. The removal of habitat in and near northern spotted owl sites—ecologically critical areas—militates in favor of requiring an EIS. *See Blackwell*, 2005 WL 8176926, at *5 (logging "within northern spotted owl critical habitat raises substantial questions about the project's environmental effects.").

Second, BLM has recognized the importance of LSRs and RRs which will be impacted by the N126 Project.[7] Courts have held that Riparian Reserves are ecologically critical areas. *See Cascadia Wildlands*, 937 F. Supp. 2d at 1283 (using the phrase "ecologically critical Riparian Reserves" when deciding whether an EIS is required). Courts have also recognized that LSRs "have been established to provide high quality habitat for species associated with late-successional forest conditions" and that any action in the LSRs must be consistent with LSR objectives. *Or. Nat. Res. Council Fund v.*

---

[7]   These land use designations were set by the Northwestern and Coastal Oregon Resource Management Plan ("2016 RMP"), which provides direction for all resources on BLM-administered lands in northwestern Oregon, including the lands at issue here. N126 AR 33534–33852. BLM's NEPA Handbook specifically states that areas with unique characteristics are generally limited to those that were identified through the land use planning process. N126 42543. The 2016 RMP, and subsequent LSRs and Riparian Reserves, arose from a land use planning process. BLM designated the LSRs and RRs, among other reasons, to meet the recovery and conservation needs of the northern spotted owl, marbled murrelet, and coho. N126 AR 34757.

*Brong*, 492 F.3d 1120, 1127 (9th Cir. 2007). Here, the N126 Project entails extensive and intensive logging in the ecologically-critical reserves: 13,353 acres in the LSRs, and 2,003 acres in the RRs. N126 AR 26. The combined impact—15,356 acres in total—further underscores the need for an EIS.

> 3.   *An EIS is required to fully evaluate effects including cumulatively significant effects.*

Finally, as discussed *supra* § VI-A-3, BLM failed to consider cumulative impacts from other projects overlapping in time and space: the Siuslaw HLB Landscape Plan, the Deadwood Creek Restoration Project, and the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project. An EIS is required to fully and adequately consider these cumulative impacts. The N126 EA offers a brief and incomplete cumulative effects analysis for the Deadwood Creek Project and does not even address the contemporaneous and overlapping Siuslaw HLB Project, or the Aquatic and Riparian Habitat Restoration Project. N126 AR 67–68. An EIS is needed to perform this analysis with the rigor and detail NEPA requires.

The Ninth Circuit has held that when one factor alone raises "substantial questions" about whether an agency action will have a significant environmental effect, an EIS is warranted. *See Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 864 (9th Cir. 2005). Here, several factors demonstrate that the N126 Project will have a significant environmental effect, including significant adverse effects to ESA-listed species and ecologically-critical habitats, highly uncertain effects resulting from the Project, and cumulatively significant impacts that BLM did not adequately consider. Ultimately, BLM's decision to authorize and implement the N126 Project without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

BLM justifies this Project and the extensive logging it entails by pointing to purported beneficial effects including restoring complex late-successional forests. *See, e.g.,* N126 AR 40–41. Restoring these forests is certainly a laudable goal. But BLM has not performed an analysis sufficient

to justify its optimism these beneficial effects will materialize, nor to understand to what extent any benefits may be offset—if not altogether outweighed—by unconsidered adverse effects in the near term.

The EA states "[s]ite-specific project implementation would verify that treatment effects fall within the range of effects described in this EA for the selected alternative, and would be consistent with the selected management approach." N126 AR 18. This comports with neither the text of NEPA nor Congress's goal of informing and involving the public early in the process. *Kern*, 284 F.3d at 1072 ("NEPA [was] not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done."); *see also 'Ilio'ulaokalani*, 464 F.3d at 1094 ("once an agency decides to implement a site-specific project, such as a timber sale, then the agency must consider the site-specific impacts of the action in that project's environmental analysis.").

## VII.  Conclusion.

For the forgoing reasons, Plaintiff asks this Court to grant the Motion for Summary Judgment, hold unlawful and set aside BLM's EA, DR, and FONSI, and remand each decision to the agency to comply with NEPA.

Respectfully submitted and dated this 9th day of February, 2024.

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401

*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,394 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, table of acronyms, signature block, and certificates of counsel.

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen (OSB #193827)
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401

*Attorney for Plaintiff*