IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**CASCADIA WILDLANDS,**

        Plaintiff,

    v.

**CHERYL ADCOCK; PAUL TIGAN;**
and **UNITED STATES BUREAU OF
LAND MANAGEMENT,**

        Defendants, and

**AMERICAN FOREST RESOURCE
COUNCIL,**

        Defendant-Intervenor.

_____

Civ. Case No 6:22-cv-00767-AA

**OPINION AND ORDER**

AIKEN, District Judge:

        Plaintiff Cascadia Wildlands moves for summary judgment against Defendant

United States Bureau of Land Management ("BLM") and two of its Field Managers

in the Northwest Oregon District, Cheryl Adcock and Paul Tigan (collectively "BLM").

Plaintiff seeks a declaration that BLM's actions violate the National Environmental

Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*.[1] BLM and Defendant-Intervenor, American Forest Resource Council ("AFRC") cross-move for summary judgment. For the reasons explained, Plaintiff's Motion for Summary Judgment, ECF No. 37, is GRANTED in part and DENIED in part. BLM's Cross-Motion for Summary Judgment, ECF No. 45, is GRANTED in part and DENIED in part. AFRC's Cross-Motion for Summary Judgment, ECF No. 46, is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

### I.      Introduction

Northern spotted owls, marbled murrelets, and coho salmon—three threatened species—inhabit the forests and watersheds of the lands at issue in this case. BLM manages these forested lands under the 2016 Northwest & Coastal Oregon Resource Management Plan ("2016 RMP or the RMP"). N126 33536. The 2016 RMP categorizes around 1.4 million acres for unique uses, such as habitat preservation and forest restoration. It also includes objectives for water quality protections and protections for ESA-listed species. The 2016 RMP envisions that BLM will pursue site-specific actions to achieve the RMP's objectives for the different uses for which it has categorized the land.

---

[1]      The Council on Environmental Quality ("CEQ") promulgates NEPA regulations, which guide federal agencies in designing their own NEPA procedures. 40 C.F.R. § 1500 *et seq*. (2020). The N126 Project began while the 1978 NEPA regulations were still in effect, and so the 1978 regulations apply to this litigation. *See* N126 AR 325 (citing 40 C.F.R § 1508.27). Unless otherwise noted, all citations to Title 40, Chapter V of the Code of Federal Regulations refer to the 2017 Edition.

In 2020, BLM designed a Landscape Plan Project, "Project N126."[2] That project involves year-round commercial and non-commercial tree thinning and harvesting that BLM asserts is key to restoring ecosystem diversity to late successional forests.

BLM analyzed the impacts from the project activities in an Environmental Assessment ("EA") and issued its Finding of No Significant Impact ("FONSI"), determining that the N126 Project would not result in significant impact to the environment. BLM approved smaller site-specific projects to achieve the program goals in N126, including the "Pucker Up" and "Gone Fishin'" Projects.

II.    The 2016 RMP and Final Environmental Impact Statement

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § *1701 et seq.*, requires BLM to prepare RMPs for the various districts under its control. *See* 43 U.S.C. § 1712. Preparation of an RMP is a "major Federal action significantly affecting the quality of the human environment," and so categorically requires preparation of an Environmental Impact Statement ("EIS"). *See* 43 C.F.R. § 1601.0-6 (BLM regulations implementing FLPMA).

In 2016, BLM issued the Northwestern and Coastal Oregon RMP, which provides the overall direction for management of BLM-administered lands in the Coos Bay, Eugene, and Salem Districts, and the Roseburg District's Swiftwater Field Office. N126 33544. The 2016 RMP reflects the input of dozens of formal cooperators including federal and state agencies, tribes, and local governments, and was

---

[2]      The parties and the Court refer to the N126 LSR Landscape Plan Project interchangeably as "the project," "Project N126," and "the N126 Project."

supported by a Final EIS spanning four volumes and over 2,000 pages. The Court refers to the 2016 RMP and its final EIS as the 2016 RMP/FEIS.

The purposes of the 2016 RMP include (1) "[p]rovid[ing] a sustained yield of timber"; and (2) "[c]contribut[ing] to the conservation and recovery of threatened and endangered species, including—[m]aintaining a network of large blocks of forest to be managed for late-successional forests; and [m]aintaining older and more structurally-complex multi-layered conifer forests." N126 33544.

These purposes are implemented through designated Land Use Allocations ("LUAs") with distinct management objectives and directions. N126 33546-48. Management directions identify what future actions are allowed within the different LUAs. *Id.* The relevant categories of LUAs described in the 2016 RMP are Late Successional Reserves ("LSRs") and Riparian Reserves ("RRs").

The primary management objectives for LSRs include: (1) maintaining nesting-roosting habitat for the northern spotted owl and nesting habitat for the marbled murrelet; (2) promoting the development of nesting-roosting habitat for the northern spotted owl in stands that do not currently support northern spotted owl nesting and roosting; and (3) promoting the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl. N126 33607.

Likewise, the primary management objectives for the RRs in the 2016 RMP include: (1) contributing to the conservation and recovery of ESA-listed fish species and their habitats; (2) maintaining and restoring natural channel dynamics,

processes, and the proper functioning condition of riparian areas; and (3) maintaining water quality and stream flows to protect aquatic biodiversity and to provide quality water for recreation and drinking water sources. N126 33611.

Sadly, according to models in the 2016 RMP/FEIS, whether BLM implements its forest management plans or conducts "no harvest" at all, the northern spotted owl is plummeting toward extirpation—that is, local extinction. N126 35700-704. BLM's simulations indicate that the northern spotted owl "currently is under significant biological stress and at risk for extirpation, over much of the moist forest-portion of its range." N126 35704. In the Coast Range-portion of the 2016 RMP, the species "already appears to be at risk for extirpation with only a 50 percent probability of persisting during the next 20 years," and has "less than a 5 percent probability of persisting to 50 years." *Id*.

There is no modeling that indicates that BLM has an opportunity to mitigate the situation through development of northern spotted owl habitat alone, especially if the rate of competition with the non-native barred owl remains unchanged. *Id*. That being said, extirpation risks with the proposed timber treatments hardly differ from extirpation risks using modeling for no timber harvest at all. The 2016 RMP/FEIS posits that habitat management combined with barred owl removal could improve outcomes. *Id*.

III.    The N126 LSR Landscape Plan and Site-Specific Treatments

The 2016 RMP envisions that BLM will propose management activities to achieve its described objectives in the various LUAs. Authorized in August 2020,

Project N126 is one such management plan. It proposes actions aimed at "speeding the development and improving the quality" of complex late-successional forests over the long-term. N126 12. Project N126 encompasses about 31,470 acres. N126 13.

Before the 2016 RMP was in effect, those 31,470 acres were managed solely to meet timber harvest figures established by the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), 43 U.S.C. 1181a *et seq*. *Id*. However, the 2016 RMP recategorized those 31,470 acres as either LSRs or RRs and directed BLM to maintain or restore complex LSR habitat for the marbled murrelet and northern spotted owl, and riparian habitat for ESA-listed fish. *Id*.

To achieve the 2016 RMP objectives for the newly classified LSRs and RRs, the proposed actions analyzed in the N126 EA include commercial timber harvest and thinning, non-commercial restoration treatments, fuels reductions, and other actions like roadwork. N126 12. The stands in the N126 project area currently "do not meet the management objectives for the LSR and RR," because they are "single-story timber plantations" with only "small pockets" of "stand complexity or biological diversity." N126 14. Further, streams in the watersheds in the project area "typically have large wood loading below desired conditions," and "the greatest benefit" that BLM can provide to stream habitat is "increasing large wood." N126 15.

Accordingly, BLM authorized integrated vegetation management in LSRs to "[p]romote the development and retention of large, open-grown trees and multi-cohort stands," promote "the development of structural complexity and heterogeneity," and "[d]evelop diverse understory plant communities" and "increase or maintain

vegetative species diversity." N126 17; N126 33609. The N126 Project EA "tiered" to the 2016 RMP/FEIS, meaning it relied on some of the effects analysis and modeling in the 2016 RMP. BLM determined that preparation of an EIS for N126 was not necessary, because the N126 EA found no new issues not already considered in the effects analysis set forth in the 2016 RMP EIS.

Consequently, BLM issued a FONSI and determined that the N126 Project would not have impacts beyond those analyzed in the 2016 RMP/FEIS and would not have significant effects on the environment. N126 1608. On August 11, 2020, BLM issued the Decision Record for Project N126. N126 1846; N126 1853. The project authorizes approximately 14,227 acres of treatment in LSRs and 2,003 acres in Riparian Reserves. N126 1847; N126 1850. Over time, the treatments BLM selected "will restore the most acres of complex late-successional forest characteristics with 19,630 acres of complexity restored to the project area" and "will ensure that the most acres are able to provide wood that would function as stable wood in streams." N126 1851.

To implement N126, BLM provided two Determinations of NEPA Adequacy ("DNAs").[3] The first is the Pucker Up Density Management ("Pucker Up") Project as a site-specific treatment of the type authorized in the N126 Project. Administrative Record for Pucker Up Density Management Project ("PU") 6. That is, as part of Project N126, Pucker Up implements the landscape plan in Project N126. In the LSR,

---

[3]    DNAs are recognized procedural tools to document that the effects of particular BLM projects are covered by existing NEPA documentation. *See* N126_29879-95, _42494-96, _42633-35. BLM may prepare an EA for a program of work, then issue a decision on the overall approach to that program, and then issue a DNA and decision for a specific action to implement that approach. N126_29884.

319 acres will be commercially thinned, and 64 acres will be non-commercially thinned. PU 6. In the RRs, 9 acres will be commercially thinned. *Id*. BLM will also construct one mile of new road and renovate about 4.5 miles of existing roads. *Id*. The Pucker Up project is outside any recently active northern spotted owl sites. PU 6.

Similarly, the Gone Fishin' Density Management ("Gone Fishin'") Project is an additional site-specific treatment of the type described in N126. Administrative Record for Gone Fishin' Density Management Project ("GF") 363-83. Appendix A to the Gone Fishin' DNA describes the harvest prescription for BLM's proposed action: 276 acres of commercial harvest in the LSR and 29 acres of non-commercial thinning in the LSR within the Lake Creek watershed. GF 11. BLM also plans to construct half a mile of new road and renovate about 7 miles of existing roads. GF 16. The Gone Fishin' project is outside any recently active northern spotted owl sites. GF 4.

IV.    The O&C Act

The O&C Act requires BLM to declare "[t]he annual productive capacity for such lands" and requires that "timber from said lands in an amount . . . not less than the annual sustained yield capacity . . . shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." 43 U.S.C. § 2601. BLM satisfies this mandate by declaring the allowable sale quantity ("ASQ") in its RMP and then selling timber from the Harvest Land Base ("HLB") LUA, which is about 20 percent of the land base and has a specific objective for sustained-yield timber production. N126 33586 (Table 1); N126 33548-49. The remaining 80 percent of the BLM-administered lands is allocated to reserves, namely LSRs and RRs, where timber

harvest does not count towards the ASQ. N126 33549-50. Here, the N126 Project is entirely within LSRs and RRs, but as can be seen, commercial harvest is permitted. N126 13.

## STATUTORY BACKGROUND

NEPA's purpose is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

To that end, NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed EIS discussing environmental impacts[4] of the proposed action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C).[5] To determine whether a proposed action will significantly affect the quality of the human environment (and therefore require an EIS), an agency may prepare an EA. 40 C.F.R. § 1501.5. "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of

---

[4]    NEPA uses the term "impact," "effect," and "affect" interchangeably throughout its regulations. The Court uses each term as NEPA uses it where possible.

[5]    Plaintiff points out that there are 49 not considered in the N126 EA. Plf. Mot. at 2. However, Plaintiff's brief appears to mention the list of 49 issues not considered as factual background, in contrast to the three issues for which Plaintiff provides well-developed argument. The Court therefore does not reach discussion of the other 49 issues referenced in Plaintiff's motion.

reasons' to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (citation omitted).

An agency fails to take a "hard look" when an EA is speculative and conclusory. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335-36 (9th Cir. 1992). Finally, Judicial review of agency actions under NEPA is limited to determining whether the agency took the requisite "hard look" at the proposed action. *Bering Strait for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir. 2008).

## STANDARD OF REVIEW

I.    Review Under the Administrative Procedures Act

Because NEPA does not create a cause of action, NEPA claims are reviewed under the Administrative Procedure Act ("APA"). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). The APA requires a reviewing court to hold unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[R]eview under the arbitrary and capricious standard is narrow, and [a court should] not substitute [its] judgment for that of the agency." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (citations and quotation marks omitted).

A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"Although ... review under the arbitrary and capricious standard is deferential, an agency's finding of no significant impact is arbitrary or capricious if the petitioner has raised substantial questions whether a project may have a significant effect on the environment." *Blue Mtns. Biodiversity Project v. Jeffries*, 99 F.4th 438, 447 (9th Cir. 2024).

## II.     Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets its burden, the party opposing the motion must present specific facts, supported by admissible evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248-49; Fed. R. Civ. P. 56(e). In cases involving the review of final agency determinations under the APA, review is limited to the administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (when reviewing a decision of an administrative agency, "summary judgment is an

appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did").

## DISCUSSION

Plaintiff asserts that BLM should have prepared an EIS for Project N126 that analyzed the "direct, indirect, and cumulative effects" of the project. Plf. Mot at 14-18. Instead, Plaintiff maintains that the N126 EA improperly "tiers" to the analysis in the 2016 RMP's FEIS, which Plaintiff argues is inadequate under NEPA. *Id*. at 15. Specifically, in Plaintiff's view, BLM failed to take a "hard look" and analyze, within the N126 project area, the significant effects on (1) the recovery and survival of the northern spotted owl; (2) slope stability, sedimentation, and landslide risk; and (3) cumulative effects of other projects in the area. *Id*. at 15, 16, 18.

BLM and AFRC respond that the N126 Project EA is properly tiered to the 2016 RMP/FEIS, which provides thorough analysis that does not need to be duplicated in a subsequent EIS. Mot. at 17-18; AFRC Mot. at 11. Further, that the N126 Project EA itself contains sufficient site-specific analysis and provided opportunities for public engagement. *Id*. Also, it prepared Determinations of NEPA Adequacy ("DNAs") for the individual timber projects authorized under N126.

I.    Whether BLM Addressed Significant Issues

Plaintiff asserts that BLM failed to take a "hard look" at significant environmental impacts of the N126 Project, and specifically that BLM's use of tiering in this particular instance was insufficient because neither the N126 EA nor the 2016 RMP/FEIS considered specific significant issues.

"Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28. "Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20

Often, an agency's management decision may occur at two administrative levels—programmatic and site-specific. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004); 42 U.S.C. § 4336e(11) (2023). At the programmatic level, the agency develops alternative management scenarios, addresses public concerns, analyzes the costs, benefits and consequences of each alternative, and adopts a management plan. *Yosemite Valley*, 348 F.3d at 800. Site-specific decisions occur at the implementation stage during which individual projects, consistent with the management plan, are proposed and assessed. *Id*.

The general rule is that NEPA requires, to the fullest extent possible, federal agencies to complete an EIS for actions significantly affecting the quality of the human environment. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (citing 42 U.S.C. § 4332(2)(C)). However, when a broad EIS has

been prepared, and a subsequent EA is prepared for an action included in the broader program, such as a timber harvest, the subsequent EA need only (1) summarize the issues discussed in the broader EIS; (2) incorporate discussions from the broader statement by reference; and (3) concentrate on the issues specific to the subsequent action. 40 C.F.R. § 1502.20. Tiering is "expressly permitted and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA review." *W. Watersheds Proj. v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (internal citation omitted).

Therefore, a programmatic EIS like the 2016 RMP/FEIS may obviate the need for a site-specific impact statement, but any "new and significant issues" that develop should be evaluated in an EA. *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F.Supp.2d 1089, 1098-99 (D. Nev. 2011), *aff'd*, 443 F. App'x 278 (9th Cir. 2011). Courts reject the adequacy of the NEPA analysis "where neither the general nor the site-specific documents address significant issues." *Id.* at 1047.

Courts view tiered analyses as a whole when determining whether they adequately address all impacts and may reject such environmental review where none of the documents address significant issues. *W. Watersheds Project at* 1047.

Here, both BLM and AFRC assert that the N126 EA properly tiered to analysis in the 2016 RMP/FEIS, which "rigorously explored" and objectively evaluated the issues Plaintiff raises. AFRC Mot. at 12; BLM Mot at 16. Because BLM extensively analyzed the environmental impacts in the 2016 RMP/FEIS, and it uncovered no

"new information," BLM argues that it fully complied with NEPA procedures. AFRC Mot. at 13; BLM Mot. at 17.

A.    Project N126 Effect On Northern Spotted Owl

Plaintiff asserts that the N126 EA failed to consider the effects of the N126 Project on the (1) recovery, (2) habitat availability, and (3) occupancy of the northern spotted owl. Plf. Mot. at 15-16. Plaintiff argues that BLM provided conclusory reasoning that "[a]ll action alternatives analyzed in detail support the recovery of the northern spotted owl in the local area because they restore suitable habitat for this species while avoiding harm to individuals during implementation." *Id*. at 16 (quoting N126 111). Plaintiff maintains that this is legally deficient and factually irreconcilable with the record.

BLM responds that the N126 EA reasonably tiered to and incorporated detailed analysis from the 2016 FEIS regarding the effects on the northern spotted owl over an area that includes the N126 project area. Further, that it also undertook additional site-specific analysis focused on N126. BLM asserts that this approach complied with NEPA.

The administrative record shows that northern spotted owls and marbled murrelets thrive in "complex late successional forest stands." N126 32. Further, that the 2016 RMP's management direction allocated large blocks of land specifically for LSRs and directs BLM to undertake projects that restore elements that give complexity to the stands within those reserves; maintain suitable habitat for the owl; and avoid incidental take. N126 48; N126 33607; N126 33573. The N126 Project is

the progeny of that direction, designed to "speed the development and improve the quality of complex late-successional forests characteristics" in the LSRs. N126 17.

In preparing the 2016 FEIS, BLM consulted with the U.S. Fish and Wildlife Service ("FWS") and adopted FSW's Revised Recovery Plan for the Norther Spotted Owl critical habitat. N126 35667. BLM designed its northern spotted owl analysis to determine if the 2016 RMP would (1) contribute to a landscape that meets the four "habitat-dependent conservation needs" of the owl, and (2) manage its lands in a manner that satisfies the FWS's "Revised Recovery Plan Actions." *Id*.

Summarized, the four "habitat-dependent conservation needs" of the northern spotted owl require: (1) large blocks of nesting, roosting, and foraging habitat that supports clusters of reproducing owls and contains spacing to facilitate owl movement between blocks; (2) habitat conditions in those large blocks that facilitate survival of dispersing owls; (3) a coordinated management effort to reduce habitat loss due to wildfires; and (4) in areas of owl population decline, sustaining a full range of survival and recovery options, in light of uncertainty.  N126 35667-668.

Likewise, the "Recovery Actions" recommended to BLM to implement from the FWS Recovery Plan are: implementing silvicultural techniques in overstocked stands and modified younger stands to accelerate structural complexity and biodiversity for owl recovery (Action 6); conserving owl sites and high value habitat (Action 10); implement post-fire silvicultural activities to restore habitat elements that take a long time to develop (Action 12); and restore well distributed, older, and more complex

conifer forests with high canopy cover, broken-topped live trees, cavities, and large snags (Action 32). N126 35668.

To evaluate the above-described four habitat-dependent conservation needs and implementation of Recovery Actions 6, 10, 12, and 32, the 2016 RMP/FEIS applied scientific studies and habitat and population response modelling to predict trends across the northern spotted owl range and account for the effects of implementing BLM's entire program of forest management work—including restoration treatments in LSRs and RRs. N126 33666-736. BLM determined that LSRs make "contributions to the development and spacing of the large habitat blocks needed" for northern spotted owl conservation and "[o]nce necessary lands are reserved, additional lands provide no appreciable benefit to the development or spacing of large habitat blocks." N126 35666; *see also* N126 35670-74 (PRMP/FEIS's analysis on the creation of large habitat blocks).

In the 2016 RMP/FEIS, BLM specifically analyzed, in minute detail, how the RMP would be consistent with FWS's 2011 northern spotted owl Recovery Plan described above. *See* N126 35667 (describing analytical methods). For habitat, BLM forecasted changes to northern spotted owl habitat from forest treatments, including restoration in LSRs, timber harvest, and wildfires. *Id*. Among many issues, The 2016 RMP/FEIS analyzed whether the management alternatives would contribute to: a landscape that creates nesting, roosting, and foraging habitat, capable of supporting reproducing owls, N126 35670-678; a landscape that facilitates owl movement between and through large blocks, N126 35678-685; and delineation of reserve land

in the moist forest where implementation of silvicultural techniques in plantations, overstocked stands, and modified younger stands would take place to benefit the northern spotted owl, N126 35711-717.

Notably, the FWS recommend to BLM that land managers enhance habitat to "promote long-term northern spotted owl conservation even when such enhancement would have short-term negative effects to the individual northern spotted owl." N126 35716. As for site-specific evaluation about occupancy, BLM determined where northern spotted owl sites were located on about 80% of its lands covered by the 2016 RMP to tabulate habitat conditions within a 500-acre core use area for the owls' home range circles. *Id*. BLM determined that, under its management directives, BLM prescriptions shall protect "all known and historical sites" by maintaining all forest habitat within 660 feet of those sites. *Id*. Under the alternatives analyzed, modeling showed that its habitat management direction would increase the type of complex forests highly desired by the owl. N126 35724.

Turning now to the N126 EA, that document tiered to the 2016 RMP/FIES. Specifically, the N126 EA incorporated the key portions of the FEIS 's analysis— described above—of effects to northern spotted owls. N126 52 (incorporating the 2016 FEIS's analysis of the formation of blocks of northern spotted owl habitat and habitat conditions that support movement and survival); *id*. (incorporating the 2016 FEIS's discussion of silvicultural actions to forest stands to benefit the owl); N126 55 (incorporating the 2016 FEIS's analysis regarding barred owls' contribution to the decline of northern spotted owls).

In addition to tiering to the 2016 RMP/FIES, the N126 EA also included its own site-specific analysis of the N126 Projects effects on the northern spotted owl, concentrating on the "issues specific" to the project area. *See* 40 C.F.R. § 1502.20; N126 00048-58. The N126 EA disclosed new information (including new project-level owl and habitat data) relevant to N126's effects. The N126 EA discussed the specific owl habitat characteristics of the N126 project area, disclosed the presence of owl sites in the area, and the quality of habitat in the project area for northern spotted owl prey. N126 00053; 00054 (table of N126's effects on the owls). The N126 EA also assessed the risks among the project alternatives to owl reproductive success and compared the alternatives regarding restoring suitable owl habitats and habitats for owl prey species. N126 00055-58.

In evaluating the N126 project area, BLM identified seven issues that required detailed "project-level" analysis. N126 00019. The N126 EA found that the treatment areas currently do not serve as suitable habitat because "they lack multi-layered canopies with a middle story of hardwood and conifer trees, overstory trees, abundant deadwood, and canopy gaps with early successional habitat." N126 53. To remedy the lack of suitable habitat, BLM determined that the most important indicator for evaluating the alternatives was "the total amount of complex late-successional forest that would be restored 40 years after treatments." N126 35. BLM found that that N126 alternative 5 "would be the best alternative for ESA-listed terrestrial species." N126 00057-58. A key reason for that determination is that it would restore the most

late successional forest characteristics in the long term—restoring approximately 19,626 acres in total. N126 40; N126 39 (Figure 3.1.7-1)

The record also shows that the N126 EA provided additional site-specific evaluation: BLM identified actual measurements for tree stands and treatment prescriptions that scientifically achieve greater complexity in the forest stands in the area. N126 35. It also identified that there are 17 northern spotted owl sites with recent activity that could be affected by treatment. N126 53. BLM accordingly determined it would coordinate with FWS to ensure that treatments would not lead to the incidental take of occupied sites, consistent with the RMP's incidental take prohibition. *Id.*; N126 33573-75. With respect to reproductive success, BLM explained that there are "nine core areas for eight spotted owl sites where [the action alternatives] would minimize risks to resident owls by maintaining at least 60 percent canopy cover," which would occur on about 170 out of 316 acres within the core areas. N126 55-56.

The record also shows that, for the two challenged site-specific projects implementing N126—Pucker Up and Gone Fishin' DNAs—BLM performed additional site-specific analysis and provided extended public comment periods. In each DNA, BLM determined that each project was consistent with the RMP because it authorizes activities that are "specifically provided for" in the LSR management direction to implement integrated vegetation management to: (1) "[p]romote the development and retention of large, open grown trees and multi-cohort stands," (2)

"[d]evelop diverse understory plant communities," and (3) "increase or maintain vegetative species diversity." PU 7; GF 5.

Under those terms, BLM determined that a DNA was appropriate, and additional NEPA analysis was unnecessary, because each project overlaps the N126 EA's analysis area; authorizes commercial and non-commercial restoration treatments consistent with the N126 EA; and has effects that are similar (both quantitatively and qualitatively) to those effects analyzed in the N126 EA. PU 7-10; GF 6-9. BLM surveyed each project area and determined that the stand conditions were "consistent with the analysis of these stands in the [N126] EA." PU 8; GF 6. BLM concluded that there was no new information and no other new circumstances "that have changed the analysis in the EA," such that additional analysis was unwarranted for the Pucker Up and Gone Fishin' Projects. PU 9; GF 7.

Even so, Plaintiff criticizes BLM for not analyzing "in detail" the N126 Project's effects on owl recovery and survival. Pl.'s MSJ at 15.

This Court recently found that a site-specific project EA may properly tier to a programmatic species-level analysis in the FEIS for the same 2016 RMP at issue here, where that analysis contemplates specific activities within a planning area. *See Klamath Siskiyou Wildlands Ctr. v. BLM ("Griffin Half Moon")*, Case No. 1:19-cv-02069-CL, 2021 WL 400137, at *4, *6 (D. Or. Jan. 21, 2021). In that case, this Court found it appropriate to tier to the 2016 FEIS's analysis of the effects on the pacific fisher because it provided a "detailed quantified analysis of the effects of timber

harvesting on the species" and the EA "included site-specific disclosures regarding the impacts of the Project on the fisher." *Id.*

Similarly, BLM has before relied on the 2016 RMP/FEIS's effects analysis related to northern spotted owl recovery, as seen in a challenge to its North Landscape Project, which was upheld by the district court and Ninth Circuit. *Klamath-Siskiyou Wildlands Ctr. v. United States Bureau of Land Management,* No. 1:19-CV-01810-CL, 2021 WL 5356969, at *1 (D. Or. Aug. 24, 2021).[6] The North Landscape Project was a multi-year project that involved 9,073 acres of harvest activities. *Id.*, at *2. The court determined that the North Landscape Project fell within the modeling region analyzed in the 2016 RMP/FEIS and that it was consistent with the RMP/FEIS's analysis. *Id.* The court acknowledged that the 2016 RMP/FEIS had "explicitly evaluated the impacts of timber harvest on [northern spotted owl] recovery" and "BLM analyzed how the various alternatives would affect each of the conservation needs and relevant recovery actions that FWS identified as important to NSO recovery." *Id.*, at *7. The court held that it "was appropriate for BLM to conduct its species recovery analysis at the [RMP/FEIS] level so that it could evaluate the impacts of the various alternatives on the [northern spotted owl] species as a whole, across the entire range." *Id.*  Further, that "BLM properly tiered to this

---

[6]    *Report and recommendation adopted sub nom. Klamath-Siskiyou Wildlands Ctr. v. United States Bureau of Land Mgmt.*, No. 1:19-CV-1810-CL, 2021 WL 5355919 (D. Or. Nov. 16, 2021), *aff'd sub nom. Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022)

recovery analysis, concluding that the site-specific impacts of the North [Landscape] Project [was] within the range of impacts disclosed in the FEIS." *Id.*

The Court finds the same is true for the N126 Project.

Specifically, the N126 EA provided a reasonably thorough discussion of its effects on northern spotted owls, including an analysis of the effects to its occupancy, habitat, recovery. The EA not only tiered to and incorporated detailed analysis from the 2016 FEIS regarding the effects of BLM management over an area including the N126 project area, but undertook additional specific analysis focused on N126.

In line with NEPA regulations encouraging "tiering," 40 C.F.R. § 1502.20, the N126 EA explicitly referenced and incorporated the 2016 FEIS. applied scientific studies and habitat and population response modelling to predict trends across the NSO's range and account for the effects of implementing BLM's entire program of forest management work—including restoration treatments in LSRs and RRs.  N126 35666-724, 35728-35.

As with the *North Landscape* EA, N126 incorporated the 2016 FEIS's owl analysis of habitat and population response that is central to the agency's owl recovery analysis. N126 110-11, 35666-727, 36505-60; *North Landscape*, 2021 WL 5356969 *7. And as in *North Landscape*, the N126 project area falls within northern spotted owl habitat and response region analyzed in the 2016 FEIS. BLM reasonably concluded that replicating the 2016 analysis at the scale of the N126 project area was unnecessary. N126 00110-11.

Therefore, the RMP/FEIS, N126 EA, and the subsequent project DNAs, when analyzed together, provide the requisite hard look at certain impacts. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018) ("[W]hen reviewing for NEPA compliance, we look to whether the agency performed the NEPA analysis on the subject action."). BLM's decision was neither arbitrary nor capricious.

B.    Project N126 Effect Of Sedimentation

Plaintiff alleges that the N126 EA "failed to consider the impacts of sedimentation on aquatic resources, including impacts to fish listed under the ESA and landslide risk." Plf. Mot. at 16-17. Plaintiff states that the EA failed to discuss sedimentation at all, and also asserts that the N126 EA fails to address the effect of landslide risk. *Id.* Plaintiff points out that BLM acknowledges the project area's history of landslides by stating that the bedrock in the area has been linked to "higher landslide susceptibility." Plaintiff quotes from the N126 EA:

> The [N126 Project] occurs on LSR landscapes proposed for thinning treatments, which were not analyzed for landslide frequency or slope instability in detail in the [2016 RMP/FEIS] due to the assumed negligible increases in landslide risk. While landslide prone landscapes comprised a small portion of the [2016 RMP/FEIS] analysis area, they comprise a large portion of the landscape within the N126 treatment area. Despite these differences, the N126 project is expected to be within the range of effects analyzed in the [2016 RMP/FEIS] because of project design features for both timber harvest and road construction.

Plf. Mot. at 17 (quoting N126 AR 105). Plaintiff's argument is that, when it comes to "landslide prone" landscapes, the 2016 RMP's zoomed-out analysis area is not comparable to the zoomed-in portion of lands that distinctly and uniquely feature such landscapes. Plf. Reply at 14.

As an initial matter, BLM asserts that Plaintiff made no mention of landslides, landslide risk, or sedimentation in its extensive (65-page) comments to BLM on the N126 EA. N126 12023-87. BLM Mot. at 24. In BLM's view, Plaintiff waived this argument by failing to put BLM on notice before the N126 decision that it was concerned about landslides and sedimentation and failed to provide BLM the opportunity to address those issues during the NEPA process. *Id*. BLM notes that, only after the fact of BLM's N126 decision, in Plaintiff's administrative protest, did Plaintiff first mention landslides, landslide risk, or sedimentation. *Id*.; *see also* N126 1292; N126 303.

Resolving the waiver issue first, plaintiffs challenging an agency action must participate in the public comment period in such a way that their statements alert the agency to the issues raised and "allow the agency to give the issue[s] meaningful consideration." *Barnes v. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011); *accord Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (holding that the plaintiff's claims could not form the basis for agency reversal where it raised those claims after the public comment period had ended). A plaintiff need not invoke "magic words" during the comment period "to leave the courtroom door open to a challenge." *Barnes*, 655 F.3d at 1133 (citing *Idaho Sporting Cong.*, 305 F.3d 957, 966 (9th Cir.2002)).

The Ninth Circuit considered the degree to which parties must raise environmental claims before the agency in *Native Ecosystems Council*. There, it allowed the plaintiffs to raise arguments where they "presented a much less refined

legal argument in their administrative appeal." 304 F.3d 886, 898 (2002). The court defined the exhaustion requirement broadly: "The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Id.* at 899. This, the court held, comported with the purposes of the exhaustion requirement: "avoiding premature claims and ensuring that the agency be given a chance to bring its expertise to bear to resolve a claim." *Id.* at 900; *see also Idaho Sporting,* 305 F.3d at 965 (using same analysis).

Here, Plaintiff's administrative protest challenging the N126 EA was sufficient to put BLM on notice that it was contesting the agency's consideration of the sedimentation and landslide issues. Evidence in the record is that BLM provided a detailed written response describing its consideration of Plaintiff's challenge to the sufficiency of the analysis in the EA about sedimentation and landslide. N126 302-304. Therefore, BLM had the opportunity to "bring its expertise to bear" on the issue to resolve Plaintiff's dispute. *Native Ecosystems Council*, 304 F.3d at 900. Accordingly, Plaintiff's challenge is proper in this Court.

Turning to BLM's other arguments, BLM asserts that the N126 EA evaluated in detail how the project alternatives would affect road-related sediment delivery and explained why slope instability was not evaluated in detail. Likewise, AFRC points to the Specialist Report for Soils and Geology ("the specialist report") that analyzed how timber activities would "affect the risk of landslides." AFRC Mot. at 19 (citing the specialist report at N126 13078). AFRC argues that in the 2016 RMP/FEIS, BLM

Page 26 – OPINION AND ORDER

relied on the specialist report framework to find that thinning does not affect landslide risk, but rather, can promote slope stability. *Id*; N126 35109.

In BLM's view, it could import that framework into its analysis of the N126 project area, and reasonably conclude that the thinning activities and new road construction would not impact landslide risks. BLM Mot. at 21-23; AFRC Mot. at 19-20. This is especially so, BLM asserts, because of specific project design elements it will incorporate to mitigate the landslide risk.

The parties' arguments about sedimentation from new road construction and sedimentation from slope instability are intermeshed and difficult to parse out. Nevertheless, it seems wise to the Court to separate out those issues, given that it appears from the record and briefing that sedimentation arises in this case from two different agency activities: (1) road construction, repair, and use for hauling, and (2) timber thinning.

### 1.    Sedimentation from Road Construction, Repair, and Hauling

Regarding sedimentation from road construction, repair, and hauling in the project area, the record is that, in the N126 EA, BLM evaluated how the project alternatives would affect road-related sediment delivery within 200 feet of streams, (because 200 feet is the furthest distance that BLM expects such sediment to travel). *See* N126 62-68 (discussing). BLM tiered to the analysis of sediment delivery in the 2016 FEIS. N126 64. BLM showed its calculations of sedimentation by ton, and disclosed that, across the seven watersheds road activities would result in an increase of <0.5 percent of sediment delivered to streams. N126 67. BLM explains that its

analysis was based on site-specific data it gleaned from the 2016 RMP's surveys of 79% of roads in the proposed treatment areas. N126 64. And BLM explained why these 79% roads are representative of the remaining 21% of routes. N126 63.

The Court finds that, while BLM undertook thorough, detailed calculations for the estimation of tons of sediment in the streams from roads, it failed to explain how that sediment would actually affect the streams or the species in the streams, like the coho salmon. The Court points out that the 2016 RMP/FEIS assumed that "BLM would construct *few miles of new roads* relative to the existing road system" and "most new roads . . . would be built on stable areas such as ridge top locations, and would mostly be short spurs to the existing collector roads." N126 35111.

It is on that basis—"few" miles of new roads—that the 2016 RMP determined that impacts from new roads "would be negligible." Here, 50 to 90 miles of new roads will be constructed, and 300 to 420 miles of roads will be renovated. N126 27. It is not clear whether that many miles of road qualifies as "few" to justify the application of the "negligible" determination in the 2016 RMP. It is an important distinction that the 2016 RMP covers millions of acres of land and the N126 project area is but a fraction of that land. "Few" roads in relation to millions of acres may not be the same 50 to 90 miles of roads in a 31,000-acre project. Perhaps it is, but the answer is not in the record.

The Ninth Circuit has explained that averaging environmental impacts across a larger project area can be "grossly misleading." *Or. Nat. Res. Council v. Brong*, 492 F.3d 1120, 1129– 30 (9th Cir. 2007). Specifically, the Ninth Circuit explained that the

averaging in that case was an attempt by the BLM "to dilute the effects of its proposed activities" and that "an agency cannot try to 'minimize' the environmental impact of an activity by simply adopting a scale of analysis so broad that it marginalizes the site-level impact of the activity on ecosystem health." *Id*. at 1130.

The Court finds that an increase of sedimentation delivery to streams is a significant issue for which the EA failed to provide a detailed analysis at the site-specific level.

### 2.    Sedimentation from Landslide/Slope-Instability

Turning to the issue of sedimentation from landslide risk, the record is that the N126 Landscape Plan project area has a history of landslides. N126 104. The soils and bedrock in the area are within the "Tyee Sandstone unit," which has been identified as an area of higher landslide susceptibility. *Id*. There are steep slopes and periods of heavy rain—factors that contribute to landslide risk. *Id*. The 2016 Final EIS explains that timber harvest is expected to affect shallow landslide risk, and acknowledges that during high-intensity rainfall, landslide frequency is higher in younger stands. *Id*. Based on that, BLM determined that for purposes of analysis in the N126 project area, "stand age" is a proxy for "time since last regeneration harvest." *Id*.

The N126 EA continues that "regeneration, or clearcut, [or] harvest would increase the relative landslide density, but that thinning was assumed to not affect landslide risk." N126 105. That is because thinning leaves "trees with viable roots" that would "remain in place to provide soil cohesion on slopes and transpire water."

*Id.* (citing the 2016 RMP/FEIS). The 2016 Final EIS focused its analysis on the Harvest Land Base, where regeneration harvests were expected to frequently occur. N126 105. In contrast, the N126 Landscape Plan project occurs on LSR landscapes proposed for thinning—rather than clearcut style—treatments. *Id.* Thinning in landslide prone areas was not analyzed for landslide frequency or slope instability in detail in the 2016 Final EIS due to the assumed negligible increases in landslide risk for thinning—versus harvest/clearcutting—activities. *Id.*

However, as Plaintiff points out, landslide prone landscapes comprised a small portion of the Final EIS analysis area but comprise a large portion of the landscape within the N126 treatment area. Despite those differences, the N126 project states that it is expected to be "within the range of effects analyzed in the Final EIS because of project design features for both timber harvest and road construction." *Id.*

To explain that conclusion, BLM elaborates that it analyzed the site and determined it would implement Project Design Features ("PDFs") to mitigate landslide risk, or to keep thinning activities contained to areas that were not at highest risk for landslide. *See* N126 EA, Appendix D, Project Design Features, N126 128).

For example, the PDFs BLM will implement under N126 include retention of larger living trees under all alternatives to provide soil cohesion and water uptake to reduce landslide likelihood. N126 105. Further, that slopes identified to be over the landslide risk thresholds for the Tyee formation (75% or steeper for most slopes, or 65% or steeper on lower-landscape position slopes within the riparian reserve), would

be avoided from treatment. *Id*. Roads would be placed on stable, mostly ridgetop locations, and follow protocols for road drainage and construction. *Id*.

The record is that the PDFs would ensure adequate drainage to avoid water concentration which can precipitate slope instability and road washouts. N126 105, 303-04, 128-42 (listing N126 project design features and best management practices). Illustrative of the types of site-specific measures BLM would implement is the seeding and mulching in operations-caused disturbed soil areas; constructing sub-surface drainage for roads; and measures to drain road surfaces. *See*, *e.g.*, N126 134, 135, 136, 137. BLM grounds its expectation that these protective features will be effective on its prior land management experience. *See* N126 35118-19.

It has been recognized that NEPA permits an agency to gauge a project's effects based on design features that are an essential part of the proposed action. *See*, *e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:12-cv-1558-CL, 2014 WL 525116 *12 (D. Or. Feb. 6, 2014). For example, design features can take the form of washing vehicles and re-seeding in an area to prevent weeds. *Bark v. BLM*, 643 F. Supp. 2d 1214, 1230 (D. Or. 2009) (crediting design features for weed management in holding that BLM took a hard look at "noxious weeds" and reducing "soil disturbance"). Design features may be forward-looking as well, contemplating "additional protective measures" for "subsequent . . . authorizations," as needed. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006). When design features reduce the effects of a proposed action, the "effects are analyzed with those measures in place." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006).

Thus, design features that are part of a project and which minimize environmental effects from the start are legitimate to show the requisite NEPA hard look. As an example of that here, the N126 EA considered the Tyee soil/bedrock that is prevalent in the area, looked to the specific nature of the N126 treatments (restoration thinning as opposed to regeneration harvest), and applied project-specific design features to account for local landslide sensitivity. *See* N126 104-05. This analysis appropriately informed BLM's hard look.

Had BLM relied *only* on the 2016 RMP/FEIS, that would not have been sufficient, because the 2016 RMP/FEIS analyzed a broad area unfocused on landslide prone landscapes, due to its scaled-out nature. However, BLM incorporated PDFs and analyzed the slope percentages that occur within the N126 project area to ensure that its project activities remained in the range of effects described in the 2016 RMP/FEIS. N126 35109, N126 35111. Therefore, BLM's use of PDFs—to minimize local, project-specific effects—and reliance on the framework of analysis in the RMP/FEIS together satisfy NEPA's hard look requirement.

C.    Project N125 and Cumulative Effects of Other Projects

Plaintiff argues that BLM failed to take a hard look at the cumulative impacts because it did not consider the impacts from the Siuslaw HLB Landscape (Siuslaw HLB Project), Deadwood Creek Restoration (Deadwood Project), and Northwest Oregon District Aquatic and Riparian Habitat Restoration (Aquatic and Riparian Habitat Project) Projects even though they "overlap in time and space with the N126 Project." Pl.'s MSJ at 18.

BLM and AFRC respond that Plaintiff's cumulative effects argument related to the Siuslaw HLB Project relies on improper extra-record evidence that should not be considered by the Court. Second, Plaintiff's cumulative effects arguments related to the Siuslaw HLB and Aquatic and Riparian Habitat Projects suffer a threshold procedural problem because Plaintiff failed to adequately raise those arguments before BLM during the administrative process and, therefore, are waived. Third, BLM took the requisite hard look at the relative cumulative impacts of the project on each resource in detail. BLM Mot. at 28, 30, 34, 37; AFRC Mot. at 22.

        1.      Waiver: Siuslaw HLB and Aquatic Restoration Projects

Noted above, a plaintiff challenging an agency action must participate in the public comment period in such a way that their statements alert the agency to the issues raised and "allow the agency to give the issue[s] meaningful consideration." *Barnes,* 655 F.3d at 1132. Plaintiff claims that it satisfied the exhaustion requirement because it alerted BLM that it was required to consider cumulative impacts *generally*. Pl.'s Reply at 17. But below is the extent of Plaintiff's cumulative impacts arguments raised during the administrative process for the draft EA:

> The new BLM RMP of course has removed these lands from that regional structure, but it still relies on the same conservation science. As a landscape plan covering one of the important pieces of the NW Forest Plan conservation puzzle, this N126 project really ought to incorporate that perspective. Doing so is a primary value that could be added at the landscape scale. This would mean that, for example, the regional conservation and recovery cumulative effects to the identified threatened species (owl, murrelet and salmon) could be considered. Especially in the context of the similar *Deadwood project on the Siuslaw*, this is a major missed opportunity. Please address this issue in an EIS.

N126 12033 (emphasis added). Plaintiff reasserted the above-mentioned language, identifying the Deadwood Creek Project, in its protest to the N126 Project. N126 1278. Plaintiff did not reference the Siuslaw HLB Project or the Aquatic Restoration Project during the administrative process, though being heavily engaged and providing extensive comments. *See, e.g.*, N126 12023-87 (Plaintiff's 65-page, single-spaced comment letter to the EA and FONSI); N126 1266-1327 (Plaintiff's 62-page, single-spaced administrative protest).

AFRC asserts that Plaintiff could have (but failed to) mentioned either project in its comments given that the Siuslaw HLB Project's and the Aquatic Restoration Project's scoping letters had already been released. *See generally* N126 12023-87. AFRC Mot. at 18-19.

The Ninth Circuit provides that "substantively distinct" issues must be identified during the administrative process. *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 572 (9th Cir. 2016). "[C]hallengers to government action cannot avoid waiver with 'cryptic and obscure' objections or issues presented at a very high level of generality." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023) (finding that, despite plaintiff's hundreds of pages of comments, it did not provide sufficient notice of its claim under the Healthy Forests Restoration Act by merely complaining of the definition of the Wildland Urban Interface).

The Court finds that the Aquatic Restoration Project and the Siuslaw HLB Project to be sufficiently distinct that Plaintiff should have identified those projects to BLM at the appropriate time.

Plaintiff insists, however, that "[b]y asking BLM to consider the cumulative impacts of the Deadwood Creek Project, Cascadia sufficiently put BLM on notice that it wanted BLM to consider the cumulative impacts of other overlapping timber projects." Plf. Reply at 19.

This District has found otherwise. *See Lindberg v. U.S. Forest Serv.*, 132 F. Supp.3d 1255, 1268 (D. Or. 2015) (explaining that the plaintiff identified three projects the agency should have analyzed but that "the Haul Road trail was not one of them," barring plaintiff from litigating the issue). The Court finds *Lindberg* instructive and finds that Plaintiff has waived its right to object to the Aquatic Restoration Project and the Siuslaw HLB Project at this stage of review because it did not notify BLM that it "believed the [projects] should be included in this Project's EA during the administrative process." *Id.*

Unlike the earlier waiver issue above, where Plaintiff brought up sedimentation and landslide concerns at *some* point in the administrative process, Plaintiff failed to do so with the Siuslaw HLB Project's and the Aquatic Restoration Project.

Alternatively, under FRE 201, Plaintiff asks the Court to take judicial notice of the Siuslaw HLB Project's NEPA documents to address Cascadia's cumulative impacts arguments because the existence of the Siuslaw HLB Project "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2).

In administrative record cases, courts have held that when a party seeks judicial notice of extra-record evidence on summary judgment in support of the merits, it is an inappropriate attempt to supplement the record. *See, e.g.*, *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 976 (9th Cir. 2006) (affirming the district court's refusal to take judicial notice of extra-record evidence in an APA case); *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 986 n.2 (9th Cir. 2015) (holding that "judicial review of an agency decision is [generally] limited to the administrative record on which the agency based the challenged decision") (internal quotation marks omitted; bracket in original)); *Greater Hells Canyon Council v. Wilkes*, No. 2:22-CV-00859-HL, 2023 WL 6443562, at *4 (D. Or. Apr. 20, 2023) ("Judicial notice is not applicable unless an exception to the record-review rule applies."). "Fundamentally, 'a party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation.'"

The Court granted Plaintiff the opportunity to identify any gaps in the administrative record, and a corresponding deadline to move to complete or supplement the record. ECF 13. That time has now passed. Therefore, the Court finds Plaintiff's request for judicial notice for extra-record BLM documents is inappropriate and declines Plaintiff's request.

2.    Cumulative Effects of the Deadwood Creek Restoration Project

Plaintiff explains that the Forest Service's Deadwood Restoration Project is within the spatial and temporal scale of N126 Project area. N126 67. However, Plaintiff asserts that the N126 EA only acknowledges the Deadwood Restoration

Project in its cumulative effects analysis on road-related sediment delivery within 200-feet of streams. Plf. Mot at 21 (citing N126 67-68). In Plaintiff's view, the N126 EA should have also considered the effects of the Deadwood Restoration Project on ESA-listed species in its cumulative effects analysis.[7]

BLM responds that it specifically considered the cumulative effects of N126 and the Deadwood Restoration Project, disclosing that the projects together would increase sediment delivery to streams. N126 67-68. BLM further asserts that, for the other six resources issues BLM analyzed in detail in the N126 EA, the agency did not identify any cumulative effects from the Deadwood Restoration Project. In BLM's view, this was entirely rational, because "nothing in NEPA requires the paperwork of mentioning individual projects in a cumulative-effects analysis when there are no effects to consider." BLM Mot. at 37.

Because BLM has "irreversibly and irretrievably" committed resources to the Siuslaw Plan, it is obligated to take a "hard look" at the N126 Project's indirect, and cumulative impacts. *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). A "hard look" requires consideration of all foreseeable direct, indirect, and cumulative impacts. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002); 40 C.F.R. § 1508.25(c) (stating that an agency "shall consider" direct, indirect, and cumulative

---

[7]    Plaintiff also cites BLM staff comments regarding increased sediment delivery in a draft version of the N126 EA, Plf. Reply 31-32, arguing that it failed to disclose that there would be sediment delivery. However, the final EA did tell the public that N126 and the Deadwood project would result in cumulative effects on sedimentation. N126 67-68. The Court does not address the argument about the draft EA.

impacts). This includes evaluation of the additive impacts of the action on top of the environmental baseline, *see* 40 C.F.R. § 1502.15 (requiring that agencies "describe the environment of the area(s) to be affected"), and a comparison to other alternative courses of action. *See* 40 C.F.R. § 1508.25(b) (agency "shall consider" alternatives).

An EA is sufficient under NEPA if "it contains a 'reasonably thorough discussion of probable environmental consequences.'" *Methow Forest Watch v. U.S. Forest Serv.*, 383 F.Supp.2d 1263, 1273 (D. Or. 2005) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003)). This includes "a useful analysis of the cumulative impacts of past, present, and future projects." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) (internal quotation marks omitted). The obligation to analyze cumulative impacts in an EA is generally limited to determining whether there are cumulative impacts that lead to a significant environmental impact requiring an EIS. 40 C.F.R. § 1508.27(b)(7).

The record is that, before the N126 EA was finalized, the United States Forest Service's Deadwood EA was "out for public comment for the purpose of aquatic and terrestrial restoration" and had overlapping portions of the haul routes with the N126 alternatives. N126 67. BLM "identified actions that would increase/decrease sediment delivery from the Deadwood Creek EA," which included "road construction, timber harvest haul on roads within 200-feet of a stream, road relocation, the addition, replacement and removal of culverts, and road decommissioning." *Id*. BLM found that the N126 and Deadwood Projects would, cumulatively, result in "an increase of between 12.3 (Alternative 2) and 102.4 percent from the existing amount

of 123.5 tons/year along the 249 haul routes." N126 68. BLM provided no further analysis of any other cumulative effects of the Deadwood Restoration Project in the N126 EA.

In response to Plaintiff's comment that BLM should consider the Deadwood Project in its analysis of effect to the northern spotted owl, BLM stated that it had "determined that there were no direct or indirect effects of its actions for ESA-listed terrestrial species habitat that would need to consider the Deadwood project from the Siuslaw National Forest," and that "[t]his EA was tiered to the 2016 RMP/Final EIS, which considered the regional effects of its action on the northern spotted owl, which many of the issues not presented in detailed analysis explain." *Id*

The Court finds that the N126 EA does not contain a "reasonably thorough discussion of probable environmental consequences." *Methow Forest Watch,* 383 F.Supp.2d at 1273. Even where BLM did discuss the increase of sedimentation from the Deadwood Restoration Project, that discussion is "cursory," because it does not contain a "useful analysis" of *how* the increased sediment effects the resources in the project area. *N. Plains Res. Council,* 668 F.3d at 1076. BLM's assertion that it relied on the 2016 RMP's "regional" analysis is not helpful to understanding the localized impact of the two projects in combination, especially with regard to sedimentation in streams inhabited by the coho salmon. Further, while the N126 EA addresses that northern spotted owl sites would be identified and avoided by BLM, the N126 EA is silent on whether the overlapping United States Forest Service project would identify and avoid owl sites.

In summary, the court's role in this process is to determine whether the agency took the requisite "hard look" that NEPA demands, by reviewing whether the EA contains "a reasonably thorough discussion" of the significant aspects of the probable environmental consequences of the proposed action. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,* 606 F.3d 1058, 1072 (9th Cir.2010). Consistent with the above discussion, BLM failed to provide a reasonably thorough discussion of the significant aspects of the effect of new road construction, repair, and haul routes; sediment delivery; and cumulative impacts of the Deadwood Restoration Project.

III.    Whether BLM Erred in Failing to Prepare an EIS

Plaintiff asserts that BLM erred in failing to prepare an EIS. This argument is a continuation of its assertion that BLM failed to look locally at the significance of the impacts of Project N126. Here, Plaintiff argues that BLM's FONSI was arbitrary and capricious based on three out of the ten "intensity factors"—ESA-listed species; unique characteristics within the project area; and cumulative effects. 40 C.F.R. §§ 1508.27(b)(3), (7), (9).

To prevail on a claim that the agency violated NEPA by failing to prepare an EIS, a claimant need not show that significant effects will occur; it is enough to raise "substantial questions" whether a project may have a significant effect on the environment. *See Greenpeace*, 982 F.2d at 1351. As the Ninth Circuit has consistently held, this is a low standard. *See, e.g., Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). Significance is evaluated using context and intensity

factors. 40 C.F.R. § 1508.27. A single intensity factor may require preparation of an EIS. *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

A.      "Listed Species" Intensity Factor

Plaintiff asserts that the N126 Project will impact the northern spotted owl, marbled murrelet, coho, and their respective critical habitat, such that an EIS is warranted. Pl.'s MSJ at 25-28.  BLM and AFRC assert that BLM reasonably analyzed the effects to the owls, murrelet, and coho, tiering to the 2016 RMP/FEIS where appropriate, and determined that there would be no significant impacts on ESA-listed species.

1.      Northern Spotted Owls

Plaintiff reasserts its argument that BLM failed to analyze how each alternative would impact northern spotted owl recovery and survival, criticizing BLM for tiering to the 2016 RMP/FEIS. Pl.'s MSJ at 25-26. As explained above, in response to Plaintiff's hard look claim, BLM adequately analyzed the project's impacts on owl recovery and survival, appropriately tiering to the 2016 RMP/FEIS in this particular circumstance.

2.      Marbled Murrelets

Plaintiff contends that BLM failed to assess the project area for murrelet nesting structures. Plf. MSJ at 26.

Under the 2016 RMP, "before modifying nesting habitat or removing nesting structure," BLM must assess the project area and lands within 726 feet of the project area for murrelet nesting structure. N126 33641; *see id.* (definition of murrelet

nesting structure). In the FONSI, BLM determined that Alternatives 2 through 5 would maintain murrelet buffer habitat in a manner consistent with the RMP. N126 1613.

The record also shows that, in the N126 EA, BLM analyzed the direct and indirect effects on marbled murrelets, focusing on the removal of any buffer habitat for murrelets, the maintenance of any existing suitable nest trees, and the development of future suitable nesting trees. *See, e.g.*, N126 20; N126 48-58. BLM concluded that Alternatives 2 through 5 would not remove any murrelet buffer habitat. N126 54. Moreover, N126 EA's PDFs require BLM to survey to protocol (as endorsed by FWS), apply seasonal restrictions if murrelets are detected, protect any known murrelet nest trees, prohibit any activities that disrupt murrelet nesting at occupied sites, and prohibit the creation of an opening within one-site potential tree height of a nesting structure. N126 130; N126 132; N126 208 (noting that "[t]he treatments proposed in the action alternatives follow best available science . . . to avoid or minimize adverse effects to marbled murrelets by maintaining nesting habitat, which includes buffer habitat and nesting structure").

The Court finds that the N126 EA contained detailed analyses of project impacts and alternatives. *See Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 602–03 (citing 40 C.F.R. § 1508.9(b)). BLM's discussion on the above issues provided a "convincing statement of reasons: to explain why project's impacts are not significant. *350 Mont. v. Haaland*, 29 F.4th 1158, 1163 (9th Cir. 2022)

However, BLM did identify an adverse effect to the marbled murrelet. The N126 EA discussed that "road construction" could affect the function of some suitable habitat. N126 54. Consistent with the Court's discussion above related to new road construction and sedimentation from new roads, this is one aspect related to the the marbled murrelet in the project area where BLM did not explain why the impact of new road construction would not be "significant" impact. Instead, BLM rationalized the impact by stating that the project would restore nesting habitat for the species and restore complex late-successional forest that is key to the species. N126 49, 56, 57-58. The Court finds that Plaintiff has raised "substantial questions" whether construction of new roads may have a significant effect on the marbled murrelet. *See Greenpeace Action*, 982 F.2d at 1351.

### 3. Coho Salmon

As an initial matter, BLM and AFRC assert that Plaintiff failed to raise any concerns about coho salmon before the agency at any point during the administrative process. BLM Mot. at 50-51; AFCR Mot. at 37. Plaintiff does not rebut that contention. Accordingly, for the reasons discussed in Section I.C.1 (waiver discussion) the Court declines to consider this claim.

### B.    "Unique Geographic Characteristics" Intensity Factor

Plaintiff contends that the N126 Project's impacts are significant because it overlaps with areas with unique characteristics, specifically ESA-listed species' critical habitat, LSRs, and Riparian Reserves. Pl.'s MSJ at 28-30. In assessing the intensity of a proposed action, agencies consider "[u]nique characteristics of the

geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3).

BLM and AFRC assert that Plaintiff never raised any concern about "unique characteristics" and that Plaintiff's claim before the federal court is waived. BLM Mot. at 52-53; AFRC Mot. at 40.

The Court finds that Plaintiff told BLM during the NEPA process that N126 commercial thinning was a good idea given the degraded condition of these specific LSR and RR lands. N126 12024. Specifically, Plaintiff stated: N126 "could do an immense amount of good," because "there is so much heavily roaded, previously logged, densely planted forest here that can be profitably thinned." N126 12024. Therefore, notwithstanding that Plaintiff's earlier comment contradicts its current position, the Court finds Plaintiff sufficiently put BLM on notice to its concerns about the unique habitat characteristics of the LSRs and RRs, but not for any of the enumerated characteristics in 40 C.F.R. § 1508.27(b)(3).

Plaintiff relies on *Cascadia Wildlands v. United States Forest Service*, 937 F. Supp.2d 1271, 1283 (D. Or. 2013), for the proposition that LSRs and Riparian Reserves serve as "ecologically critical areas." Plf. Mot. at 28-29. That case, however, found that Riparian Reserves were "ecologically critical" when evaluating the plaintiff's claim that the project violated the Forest Plan's Aquatic Conservation Strategy objective under the National Forest Management Act—not in the context of

the "unique characteristics" intensity factor. *Id*. Therefore, *Cascadia Wildlands* does not bear on whether Riparian Reserves or LSRs serve as "ecologically critical areas."

Further, courts have rejected the contention that the mere presence of an ecologically critical area requires the preparation of an EIS. For example, in *Smith v. United States Forest Service*, the Ninth Circuit held that logging in a roadless area does not automatically warrant an EIS. 33 F.3d 1072, 1079 (9th Cir. 1994) (noting that "an EIS may not be *per se* required under such circumstances"); *accord Ctr. for Biological Diversity v. Gould*, 150 F.Supp.3d 1170, 1184 (E.D. Cal. 2015). Likewise, NEPA "does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment." *Native Ecosystems Council*, 428 F.3d at 1240.

Here, the N126 Project is aimed at speeding up the development of complex late-successional forest characteristics in reserves. N126_17. Beyond a generalized assertion of negative effects, Plaintiff does not make a specific allegation that the N126 Project's thinning activities will not improve stand complexity in those reserves or that it is inconsistent with the RMP's management direction for LSRs and Riparian Reserves. The Court finds that BLM reasonably determined that Alternatives 2 through 5 are consistent with the RMP's management direction, with the most amount of complex late-successional forest created under Alternative 5. N126 31-32; N126 46.

As for Plaintiff's contention that the project's impacts will have significant impacts on northern spotted owl critical habitat, the Court appropriately addressed

that above in the discussion of impacts ESA-listed species, in Section I.A. see also C.F.R. § 1508.27(b)(9)), Accordingly, BLM reasonably concluded that the impacts to NSO critical habitat were not significant.

C.    "Cumulative Effects" Intensity Factor

Plaintiff reasserts its argument that BLM failed to consider cumulative impacts from other projects overlapping in time and space: the Siuslaw HLB Landscape Plan, the Deadwood Creek Restoration Project, and the Northwest Oregon District Aquatic and Riparian Habitat Restoration Project. Plf. Mot. at 30. In Plaintiff's view, an EIS is required to fully and adequately consider these cumulative impacts.

For the reasons already explained, the Court will not address Plaintiff's claims concerning the Siuslaw HLB Project or the Aquatic Restoration Project. Section I.C.1. (discussing waiver). Likewise, the Court addressed BLM's consideration of the cumulative effects of the Deadwood Restoration Project and found that the N126 EA does not contain a "reasonably thorough discussion of probable environmental consequences" with regard to sedimentation delivery to streams and lack of discussion related to the northern spotted owl. Section I.C.2. The Court finds its prior discussion applicable here.

IV.    Remedy

For its part, Plaintiff asks this Court to hold unlawful and set aside BLM's EA, DR, and FONSI, and remand each decision to the agency to comply with NEPA. Plf.

Mot. at 39. BLM maintains that the Court should order further briefing and proceedings regarding an appropriate remedy. BLM Mot. at 61.

The Court finds that briefing will be helpful to the Court's determination of the remedy in this case. The Court ORDERS the parties to submit briefing on the proper remedy in thirty (30) days of the date of this opinion.

The Court also encourages the parties to negotiate a settlement to resolve the issues. If the parties wish to pursue a settlement conference, the parties shall notify the Court within thirty (30) days of this opinion to schedule a Telephonic Status Conference and apprise the Court of its intention to do so.

## CONCLUSION

For the reasons explained, Plaintiff's Motion for Summary Judgment, ECF No. 37, is GRANTED in part and DENIED in part. BLM's Cross-Motion for Summary Judgment, ECF No. 45, is GRANTED in part and DENIED in part. AFRC's Cross-Motion for Summary Judgment, ECF No. 46, is Granted in part and DENIED in part. AFRC's Motion to Strike, ECF No. 46, is GRANTED.  The parties are ORDERED to submit briefing on the appropriate remedy in thirty (30) days of this opinion. Briefing shall not exceed five (5) pages per party. If the parties wish to participate in a settlement conference, the parties shall contact the Court within thirty (30) days of this opinion to inform the Court.

IT IS SO ORDERED

Dated March 31, 2025                    /s/Ann Aiken
                                        Ann L. Aiken
                                        United States District Judge